[No. B194037. Second Dist., Div. Four. Jan. 31, 2008.]

KELLY McCLAIN, Plaintiff and Appellant, v.
OCTAGON PLAZA, LLC, Defendant and Respondent.

### COUNSEL

Law Office of Joseph R. Brown and Joseph R. Brown for Plaintiff and Appellant.

Law Offices of J. Steven Kennedy and J. Steven Kennedy for Defendant and Respondent.

### OPINION

**MANELLA, J.**—In appellant Kelly McClain's action against respondent Octagon Plaza, LLC (Octagon), the trial court sustained a demurrer without leave to amend to her claims for misrepresentation, breach of the covenant of good faith and fair dealing, and declaratory relief. Following a trial, the court concluded that she had failed to establish her remaining claims for violation of the Consumer Credit Reporting Agencies Act (Civ. Code, § 1785.1 et seq.) (CCRAA) and an accounting. We affirm the rulings regarding the claims for breach of the covenant of good faith and fair dealing and violation of the CCRAA, and otherwise reverse.

## RELEVANT FACTUAL AND PROCEDURAL
## BACKGROUND

McClain operates a business known as "A+ Teaching Supplies." Ted and Wanda Charanian, who are married, are the principals of Octagon, which

owns and manages a shopping center in Valencia. On February 28, 2003, McClain agreed to lease commercial space within the shopping center for a term of five years two months, with an option to extend the lease for two additional five-year terms. The lease executed by the parties is a standard form agreement prepared by the American Industrial Real Estate Association, and is entitled "Standard Industrial/Commercial Multi-Tenant Lease—Net." The tenant on the lease is identified as "Kelly McClain dba A+ Teaching Supplies."

Paragraph 1.2(a) of the lease describes the size of the unit leased by McClain as "approximately 2,624 square feet," and attached to the lease is a diagram of the shopping center that represents the size of the unit as 2,624 square feet. Paragraph 2.1 states: ". . . Unless otherwise provided herein, any statement of size set forth in this Lease, or that may have been used in calculating Rent, is an approximation which the Parties agree is reasonable and any payments based thereon are not subject to revision whether or not the actual size is more or less." Paragraph 2.4 further provides: "Lessee acknowledges that: (a) it has been advised by Lessor . . . to satisfy itself with respect to the condition of the Premises . . . , and their suitability for Lessee's intended use, [and] (b) Lessee had made such investigation as its deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises . . . ."

With qualifications not relevant here, paragraph 1.5 of the lease obliges McClain to pay $3,804 per month as "Base Rent." In addition, paragraphs 1.6 and 4.1 require McClain to pay as additional rent 23 percent of the "Common Area Operating Expenses" (common expenses), which are defined in paragraph 4.2 as costs incurred by Octagon for enumerated purposes "relating to the ownership and operation" of the shopping center. Paragraph 4.2 provides that McClain's share of the common expenses is due no later than 10 days after Octagon provides her with "a reasonably detailed statement of actual expenses." Paragraph 4.2 also permits Octagon, at its option, to estimate the common expenses for the upcoming calendar year and to require McClain to pay a prorated share of the estimate with her monthly base rent during the year. Under this option, Octagon is obliged to provide McClain with a "reasonably detailed statement" showing her share of the actual annual common expenses within 60 days after the end of the calendar year. If McClain underpays her share of the common expenses, she must pay the balance owing no later than 10 days after receiving the statement; if McClain overpays her share, she is to receive a credit against her share of the common expenses for the forthcoming year.

After a dispute arose concerning McClain's share of the common expenses, she filed an action in small claims court, which was eventually transferred to superior court. The action was resolved by a settlement in November 2004.

On June 17, 2005, McClain initiated the underlying action against Octagon. After the trial court sustained a demurrer with leave to amend to the claims for misrepresentation and declaratory relief asserted in her complaint, McClain filed a first amended complaint (FAC), which contained claims for negligent or intentional misrepresentation, breach of the covenant of good faith and fair dealing, declaratory relief, violation of the CCRAA, and an accounting. Regarding the first three claims, the FAC alleged that the Charanians induced her to agree to pay excessive rent by intentionally or negligently misstating the size of her unit prior to the execution of the lease. The FAC further alleged that Octagon violated the CCRAA by improperly obtaining her credit report in March 2005. Finally, it sought an accounting and declaratory relief with respect to the statement that she received in February 2005 regarding her share of the common expenses for the 2004 calendar year.

On November 11, 2005, the trial court sustained Octagon's demurrer to the first three claims, concluding that the lease, by its plain language, barred McClain from asserting the claims. Following a bench trial, the trial court determined that the Charanians had not violated the CCRAA in obtaining McClain's credit report, and that McClain had no right to an accounting under the lease. Judgment in Octagon's favor was entered on August 15, 2006.

## DISCUSSION

McClain contends that the trial court erred in sustaining the demurrer without leave to amend and in denying her remaining claims after trial.

### A. *Demurrer*

#### 1. *Standard of Review*

"Because a demurrer both tests the legal sufficiency of the complaint and involves the trial court's discretion, an appellate court employs two separate standards of review on appeal. [Citation.] . . . Appellate courts first review the complaint de novo to determine whether or not the . . . complaint alleges facts sufficient to state a cause of action under any legal theory, [citation], or in other words, to determine whether or not the trial court erroneously sustained the demurrer as a matter of law. [Citation.]" (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879 [6 Cal.Rptr.2d 151], fn. omitted.)

"Second, if a trial court sustains a demurrer without leave to amend, appellate courts determine whether or not the plaintiff could amend the

complaint to state a cause of action. [Citation.]" (*Cantu v. Resolution Trust Corp., supra*, 4 Cal.App.4th at p. 879, fn. 9.)

Under the first standard of review, "we examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory. [Citation.] We treat the demurrer as admitting all material facts which were properly pleaded. [Citation.] However, we will not assume the truth of contentions, deductions, or conclusions of fact or law [citation], and we may disregard any allegations that are contrary to the law or to a fact of which judicial notice may be taken. [Citation.]" (*Ellenberger v. Espinosa* (1994) 30 Cal.App.4th 943, 947 [36 Cal.Rptr.2d 360].) If a proper ground for sustaining the demurrer exists, "this court will . . . affirm the demurrers even if the trial court relied on an improper ground, whether or not the defendants asserted the proper ground in the trial court. [Citation.]" (*Cantu v. Resolution Trust Corp., supra*, 4 Cal.App.4th at p. 880, fn. 10.)

Under the second standard of review, the burden falls upon the plaintiff to show what facts he or she could plead to cure the existing defects in the complaint. (*Cantu v. Resolution Trust Corp., supra*, 4 Cal.App.4th at p. 890.) "To meet this burden, a plaintiff must submit a proposed amended complaint or, on appeal, enumerate the facts and demonstrate how those facts establish a cause of action." (*Ibid.*)

### 2. *Misrepresentation*

■ McClain contends that the FAC adequately alleges a claim for fraud in the inducement, that is, misrepresentation involving a contract in which "the promisor knows what he or she is signing but consent is induced by fraud." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 297, p. 324, italics omitted.) We agree. ■ Generally, " ' "[t]he elements of fraud, which give[] rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' [Citation.]" (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173 [132 Cal.Rptr.2d 490, 65 P.3d 1255].) Claims for negligent misrepresentation deviate from this set of elements. ■ "The tort of negligent misrepresentation does not require scienter or intent to defraud. [Citation.] It encompasses '[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true' [citation], and '[t]he positive assertion, in a manner not warranted by the

information of the person making it, of that which is not true, though he believes it to be true' [citations]." (*Id.* at pp. 173–174.)[1]

Regarding the fraud claim, the FAC alleges the following facts: In January 2003, when McClain investigated leasing space in the shopping center, Octagon informed her that the unit in which she was interested comprised exactly 2,624 square feet. Because the base rent in the shopping center was $1.45 per square foot per month, McClain's total base rent would be $3,804 per month. Moreover, because the unit occupied 23 percent of the shopping center, McClain would be responsible for this share of the common expenses.

Prior to entering into the lease, McClain attempted to confirm the size of the unit. The Charanians, who purported to be offended by her inquiries, responded that measuring the area would be unreasonably costly due to the unit's unusual angles. They insisted that they had intimate knowledge of every detail of the shopping center, and that McClain could rely on their representations regarding the sizes of the unit and the shopping center. Due to the Charanians' pretense that they were offended by her request to confirm the size of the unit and their repeated assurances that McClain could rely on their honesty and accuracy, McClain was induced to accept their representations, and she placed reasonable reliance upon the representations in executing the lease.

The Charanians knew, or had reason to know, that the representations were materially inaccurate. In early 2005, McClain obtained a copy of Octagon's application for earthquake insurance, which disclosed that the correct size of the shopping center was 12,800 square feet, rather than the 11,835 square feet the Charanians had used in calculating McClain's share of the common expenses. Upon investigation, she also discovered that her unit occupied approximately 2,438 square feet, rather than the 2,624 square feet represented. Had she known the correct sizes, she would not have agreed to the base rent and share of the common expenses stated in the lease. Under the agreed-upon rental rate of $1.45 per square foot, the base rent for the unit should have been $3,535.10 per month, rather than $3,804, as recited in the lease; moreover, McClain should have been allocated 19 percent of the common expenses, rather than the 23 percent share that she accepted under the lease. As a result of Octagon's misrepresentations, she was induced to enter into a lease that obliged her to pay excess rent of more than $90,000 over the term of the lease.

---

[1] Under California law, a defrauded party to a contract may elect to rescind the contract and seek restitution, or stand on the contract and recover damages arising from the fraud. (5 Witkin, Summary of Cal. Law, *supra*, Torts, §§ 827–829, pp. 1200–1202.) Here, the FAC seeks damages rather than rescission of the lease.

These allegations, considered in isolation, are sufficient to establish the elements of a claim for intentional or negligent misrepresentation. In *O'Hara v. Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798, 804–806 [142 Cal.Rptr. 487], a tenant asserted a fraud claim against her landlord, alleging that the landlord induced her to rent an apartment by misrepresenting the existence of security measures in the building, and that she suffered injuries as a result of the absence of these measures. The court held that the fraud claim was adequately pleaded, reasoning that "[s]ince [the tenant] did not know the true facts and since [the landlord] had superior knowledge, the allegations, if proved, would support a finding of justifiable reliance." (*Id.* at p. 805.) We reach the same conclusion here.

■ The key issue, therefore, is whether the terms of the lease rendered McClain's fraud claim untenable.[2] Section 1668 of the Civil Code provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, . . . whether willful or negligent, are against the policy of the law." This provision encompasses intentional and negligent misrepresentation. (*Blankenheim v. E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1471–1473 [266 Cal.Rptr. 593].) Accordingly, as Witkin explains: "A party to a contract who has been guilty of fraud in its inducement cannot absolve himself or herself from the effects of his or her fraud by any stipulation in the contract, either that no representations have been made, or that any right that might be grounded upon them is waived. Such a stipulation or waiver will be ignored, and parol evidence of misrepresentations will be admitted, for the reason that fraud renders the whole agreement voidable, *including the waiver provision*." (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 304, p. 330.)

■ Under these principles, California courts have concluded that a variety of contract terms neither bar fraud claims nor establish as a matter of law that reliance upon the defendant's misrepresentations was unjustifiable. (See *Hinesley v. Oakshade Town Center* (2005) 135 Cal.App.4th 289, 300–302 [37 Cal.Rptr.3d 364] (*Hinesley*), and cases cited therein.) For example, in *Hinesley*, the plaintiff asserted a fraud claim against his landlord, alleging that when he leased commercial space in a shopping center, the landlord's agent told him that other units in the shopping center would be occupied by businesses likely to attract heavy "foot traffic." (*Id.* at p. 292.) The lease in question contained a provision that expressly accorded the landlord the exclusive right to select other tenants, and recited that the plaintiff had not relied on any representation regarding other tenants. (*Id.* at p. 297.) After the landlord obtained summary judgment on the plaintiff's claims, the court in

---

[2] Because the lease constitutes the "foundation" of the fraud claim and is incorporated into the FAC, the trial court properly examined the lease in assessing whether the claim is legally tenable. (4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, §§ 390–391, pp. 487–488.)

*Hinesley* determined that the lease provision could not by itself absolve the landlord of liability for fraud. (*Id.* at pp. 300–302.) In addition, the court reasoned that the provision did not, as a matter of law, preclude a finding of justifiable reliance, and that its presence in the lease was merely a factor to be considered in the determination of justifiable reliance. (*Id.* at pp. 301–302.) The court nonetheless affirmed summary judgment, concluding that the evidence, viewed in its entirety, established that the plaintiff had not placed reasonable reliance on the agent's misrepresentations. (*Id.* at pp. 302–304.)

It is well established that the kind of disclaimer in paragraph 2.4, which asserts that McClain had an adequate opportunity to examine the leased unit, does not insulate Octagon from liability for fraud or prevent McClain from demonstrating justified reliance on the Charanians' representations. (*City of Salinas v. Souza & McCue Construction Co.* (1967) 66 Cal.2d 217, 224–225 [57 Cal.Rptr. 337, 424 P.2d 921], disapproved on another ground in *Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 14 [84 Cal.Rptr. 173, 465 P.2d 61] [term in construction agreement requiring contractor to examine project site does not preclude fraud claim or establish unjustified reliance]; *Simmons v. Ratterree Land Co.* (1932) 217 Cal. 201, 203–204 [17 P.2d 727] [provision in real estate contract that buyer had investigated property and relied only on representations in contract did not protect seller from liability for fraud]; *Crawford v. Nastos* (1960) 182 Cal.App.2d 659, 665–666 [6 Cal.Rptr. 425] [provision in real estate contract that buyer had inspected well and accepted it " 'as is' " did not insulate seller for liability for damages from fraud]; *Smith v. Rickards* (1957) 149 Cal.App.2d 648, 653–654 [308 P.2d 758] [contract term stating that buyer had inspected business and was familiar with its location and condition did not bar fraud claim].) Accordingly, the focus of our inquiry is paragraph 2.1, which asserts that "any statement of size" in the lease or used to calculate rent "is an approximation which the Parties agree is reasonable and any payments based thereon are not subject to revision whether or not the actual size is more or less."

In our view, this provision does not insulate Octagon from liability for fraud or establish that McClain's reliance on the Charanians' alleged misrepresentations was unjustifiable as a matter of law. Our view is informed by our Supreme Court's decision in *E. H. Morrill Co. v. State of California* (1967) 65 Cal.2d 787, 794 [56 Cal.Rptr. 479, 423 P.2d 551] (*E. H. Morrill Co.*). There, a contractor entered into a construction agreement to build a facility for the State of California. The agreement described the subsurface composition of the building site, but recited that the description contained approximations; in addition, it obliged the contractor to make its own investigation. (*Id.* at pp. 789–790.) The agreement further provided that the description was confined to the actual results of the state's investigation and was " 'only included for the convenience of bidders' "; that the state's investigation of subsurface conditions had been made only " 'for the purpose of design' ";

and that the inclusion of the description in the agreement did not relieve the contractor of its obligation to make its own investigation. (*Id.* at pp. 790–791.) Notwithstanding the disclaimers and exculpatory terms of the agreement, the court concluded that the description constituted a "positive assertion of fact" which could support a claim for fraudulent misrepresentation. (*Id.* at pp. 791–792.) It added: "The contention . . . that an allegation of justifiable reliance on such representations is precluded as a matter of law because of [the disclaimers and exculpatory terms] . . . is . . . untenable." (*Id.* at p. 794.)

■ Here, the Charanians' alleged precontractual figures for the unit's size and McClain's share of the common expenses—respectively, 2,624 square feet and 23 percent—were repeated (with qualifying language) in the lease. In view of the similarity between the lease and the agreement in *E. H. Morrill Co.*, we conclude that the terms of the lease—including the exculpatory provisions in paragraph 2.1—do not bar McClain from asserting her fraud claim or showing that the misrepresentations reasonably induced her to accept the lease.

This conclusion finds additional support in *Furla v. Jon Douglas Co.* (1998) 65 Cal.App.4th 1069 [76 Cal.Rptr.2d 911] (*Furla*). There, a homeowner and his brokers represented in a listing service and elsewhere that the house the owner was attempting to sell was 5,500 square feet. (*Id.* at pp. 1072–1075.) The buyer's sales agreement with the owner provided in paragraph 18F: " 'Buyer is . . . aware that Broker makes no representations with respect to . . . square footage of the subject lot or the improvements thereon. Information, if any, on square footage provided in [the listing service] . . . and information materials concerning the Property are approximations only. By obtaining a survey of the Property or having a professional appraiser measure the Property, Buyer may verify . . . square footage.' " (*Id.* at p. 1079.) Following the sale, the buyer discovered the house was only 4,300 square feet, and initiated an action for fraud and rescission. (*Id.* at p. 1072.) The trial court granted summary judgment in favor of the owner and his brokers, reasoning, inter alia, that the owner could not establish reasonable reliance on the defendants' representations. (*Ibid.*)

On appeal, the owner and brokers did not assert that paragraph 18F operated as an exculpatory clause, but contended that it established that the buyer's reliance on the presale representations of size was unreasonable because he was on notice that they were " 'approximations only.' " (*Furla, supra,* 65 Cal.App.4th at p. 1080.) In reversing the summary judgment, we rejected this contention: "Assuming that paragraph 18F put [the buyer] on notice that prior statements of square footage were approximations only, it is still a question of fact for a trier of fact whether [the buyer] reasonably relied

upon defendants' approximations. Defendants assume that if their prior estimates of square footage are treated as approximations, defendants cannot be liable. . . . But according to [the buyer's] theory of the case, the estimate of 5,500 square feet was not merely inaccurate, it was *grossly* inaccurate, by more than 20 percent. Defendants' own citation of a dictionary definition of 'approximate' includes 'near to; about; a little more or less; close.' The alleged error here was not de minimis, and cannot be ignored. We cannot say that no reasonable jury could conclude that an 'approximation' of square footage which is wildly exaggerated amounts to an actionable misrepresentation of fact." (*Furla, supra*, 65 Cal.App.4th at p. 1080.)

Here, McClain alleges that the Charanians exaggerated the size of her unit by 186 square feet, or 7.6 percent of its actual size, and increased her share of the common expenses by 4 percent through a calculation that understated the size of the shopping center by 965 square feet, or 8.1 percent of its actual size. Although these discrepancies are smaller than those at issue in *Furla*, they cannot be regarded as de minimis or necessarily "near to" the actual sizes as a matter of law. As alleged in the complaint, they operated to increase the rental payments incurred by McClain's retail business by more than $90,000 over the term of the lease. In view of *Furla*, the fact that paragraph 2.1 put McClain on notice that the Charanians' representations of size were approximations does not preclude her from showing that they were, in fact, materially and unreasonably inaccurate.[3]

■ In an apparent effort to distinguish *Furla*, Octagon argues that paragraph 2.1 not only uses the term "approximation," but states (1) that the parties agreed the approximations were "reasonable" and (2) that McClain's rent was not subject to revision regardless of the actual sizes. These clauses do not aid Octagon. As to element (1), a stipulation intended to bar a party's

[3] During oral argument, Octagon's counsel suggested that the term "approximation" in paragraph 2.1 gave any prospective lessee notice that no firm or actionable representations about size were made in the lease. However, the question is not whether the term puts a prospective lessee on notice that the stated size may not be precisely accurate. It does. The question is whether it necessarily renders any deviation from the stated size immaterial. It does not. Where, as here, the deviations cannot be said to be immaterial as a matter of law, the use of the term "approximation" cannot insulate a lessor from potential liability for misrepresentations about size.

Octagon's counsel also suggested that because the FAC alleged that McClain had been assured the square footage figures used in the lease were "exact," the contract's "approximation" language necessarily put her on notice of a discrepancy she should have pursued. This may well be relevant to McClain's demonstration of reasonable reliance, but it does not bar her claim as a matter of law. (See *Hinesley, supra*, 135 Cal.App.4th at p. 301 [lease clause providing that tenant was not relying on existence of other tenants was relevant in determining whether tenant's alleged reliance on agent's representations of existing tenants was reasonable: "[T]he rule that this kind of contract provision does not, as a matter of law, preclude a finding of fraud does not mean the contract provision is in every case irrelevant."].)

fraud claims does not bind the party, and thus the insertion of language agreeing that a material misrepresentation is "reasonable" is of no effect. (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 304, p. 330.) If, as McClain asserts, the Charanians assured her that the square footage represented was accurate and dissuaded her from taking her own measurements, any agreement that the measurement set forth in the lease was reasonable reflects nothing more than a belief induced by such misrepresentations.

Similarly, to the extent element (2) purports to insulate Octagon from liability for any discrepancy—no matter how great—between the actual square footage and that represented in the lease, it is akin to an "as is" clause. California courts have routinely rejected such clauses as ineffective in insulating a contracting party from fraud claims regarding nonobvious defects in goods. (See, e.g., *Orlando v. Berkeley* (1963) 220 Cal.App.2d 224, 228–229 [33 Cal.Rptr. 860] [contractual clause that provides, " 'Buyer agrees to waive termite clearance and to absolve seller of any warranty, accepting house *AS IS* . . .' " does not bar claim for concealment of termite infestation in house].) In sum, the trial court erred in sustaining the demurrer with respect to McClain's misrepresentation claim.

### 3. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

■ We reach the contrary conclusion regarding McClain's related claim for breach of the implied covenant. Generally, every contract, including commercial leases, " ' "imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." [Citation.]' " (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371–372 [6 Cal.Rptr.2d 467, 826 P.2d 710], quoting *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683–684 [254 Cal.Rptr. 211, 765 P.2d 373].)

Regarding this claim, the FAC alleges that Octagon breached the implied covenant "by negotiating with McClain for the rental of the Premises on a per-square foot basis and then intentionally, or negligently, overstating the true size of the Premises. The net result of the foregoing was that Octagon pulled a 'bait & switch' on McClain in that Octagon negotiated a per-square foot price for the Premises and then inserted only its fraudulently derived amount for the base rent as the purported final agreement between the parties in the Lease. The net result was that Octagon intentionally deprived McClain of the benefit of her bargain by surreptitiously charging her a rental rate which was far in excess of the mutually negotiated price." (Italics omitted.)

The FAC also alleges that Octagon breached the implied covenant "by negotiating the [common expenses] charges with her on a per-square foot

basis, which Octagon held out as a reflection of the ratio which the Premises held to [the] size of the Shopping Center as a whole. Octagon falsely represented the ratio to be 23 [percent]. Octagon induced McClain to enter into the Lease which provided that her proportional share of the annual [common] expenses were [*sic*] 23 [percent], when it knew or had reason to know that the true ratio was substantially less." Finally, the FAC alleges that Octagon breached the implied covenant because the Charanians repeatedly assured McClain that their representations were trustworthy.

■ Insofar as these allegations assert that Octagon violated the implied covenant during the negotiations of the lease, they fail to state a claim. As the court explained in *Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1031–1035 [14 Cal.Rptr.2d 335], the implied covenant is a supplement to an existing contract, and thus it does not require parties to negotiate in good faith prior to any agreement.

In an apparent effort to avoid the operation of this principle, McClain contends that the FAC alleges—or can be amended to allege—that before the parties executed the lease, they entered into *another* agreement with materially different terms regarding McClain's rent. She argues that Octagon breached the implied covenant by "inserting erroneous figures for the base rent and the [common expense] charges into the [l]ease which did not reflect the contract terms upon which the parties had mutually agreed and which McClain had intended."

■ No such allegation can cure the deficiency explained above. It contradicts the allegations in the FAC and McClain's original complaint that McClain *accepted* the Charanians' representations about the size of her unit and her share of the common expenses, which were incorporated into the lease. Generally, "[a] plaintiff may not avoid a demurrer by pleading facts or positions in an amended complaint that contradict the facts pleaded in the original complaint or by suppressing facts which prove the pleaded facts false. [Citation.] Likewise, the plaintiff may not plead facts that contradict the facts or positions that the plaintiff pleaded in earlier actions or suppress facts that prove the pleaded facts false. [Citation.]" (*Cantu v. Resolution Trust Corp., supra,* 4 Cal.App.4th at p. 877, italics omitted.) That is the case here.

### 4. *Declaratory Relief*

■ Because the FAC adequately alleges a fraud claim based on misrepresentations about her proper base rent and share of the common expenses under the lease (see pt. A.2., *ante*), the trial court erred in sustaining the demurrer to McClain's claim for declaratory relief. As the court explained in *Ludgate Ins. Co. v. Lockheed Martin Corp.* (2000) 82 Cal.App.4th 592, 605

[98 Cal.Rptr.2d 277]: "The existence of an 'actual controversy relating to the legal rights and duties of the respective parties,' suffices to maintain an action for declaratory relief. [Citation.] Code of Civil Procedure section 1060 is clear: 'Any person interested under a written instrument, . . . or under a contract, or who desires a declaration of his or her rights or duties with respect to another, or in respect to, in, over or upon property, . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court . . . for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract.' " Here, the FAC adequately alleges an "actual controversy" regarding McClain's obligations to pay rent and other expenses under the lease, and thus pleads a claim for declaratory relief.

### B. CCRAA Claim

McClain contends that the trial court erred in determining that she failed to establish her claim under the CCRAA. For the reasons explained below, we disagree.

Generally, the CCRAA "limits the dissemination of consumer credit information." (*Olson v. Six Rivers National Bank* (2003) 111 Cal.App.4th 1, 8 [3 Cal.Rptr.3d 301].) Under Civil Code section 1785.3, subdivision (c), a " '[c]onsumer credit report' " is defined as "any written, oral, or other communication of any information by a consumer credit reporting agency bearing on a consumer's credit worthiness, credit standing, or credit capacity, which is used or is expected to be used, or collected in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for: (1) credit to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) hiring of a dwelling unit . . . , or (4) other purposes authorized in Section 1785.11."[4] The definition expressly exempts certain categories of credit reports, including reports "furnished for use in connection with a transaction which consists of an extension of credit to be used solely for a commercial purpose." (§ 1785.3, subd. (c).)

Section 1785.11 authorizes consumer credit reporting agencies to provide a consumer credit report without the consumer's prior written consent only in enumerated circumstances. Pertinent here is subdivision (a)(3)(F) of section 1785.11, which permits an agency to provide a consumer credit report to a person it has reason to believe "has a legitimate business need for the information in connection with a business transaction involving the consumer." Also of importance here is subdivision (a)(1) and (2) of section

---

[4] All further statutory citations are to the Civil Code.

1785.19, which authorizes the imposition of a civil penalty not exceeding $2,500 on any person who "knowingly and willfully" obtains access to or data from a consumer's credit file "other than as provided in Section 1785.11."

Only "[c]onsumer credit reporting" is subject to the CCRAA. (§ 1785.41.) Section 1785.41 provides: "Commercial credit reports, which differ significantly, are not subject to [the CCRAA]. The circumstances, business practices, and reports themselves differ sufficiently to make it impractical to include commercial credit reports under the [CCRAA]." With exceptions not relevant here, section 1785.42 defines a commercial credit report as "any report provided to a commercial enterprise for a legitimate business purpose, relating to the financial status or payment habits of a commercial enterprise which is the subject of the report."

At trial, McClain contended that the Charanians violated the CCRAA by improperly obtaining her credit report without her consent. The evidence at trial established that in February 2005, Ted Charanian opened an online credit information account with Citi Credit Bureau (Citi), and that in March 2005, he obtained a credit report on McClain from Citi. McClain testified that she never authorized the Charanians to gain access to her personal credit information. In addition, she submitted testimony from Jimmy Yu, a Citi employee, and records from Citi, indicating that Ted Charanian had stated that his purpose in opening the Citi account was "Tenant screening, management for self."

Ted Charanian testified as follows: When McClain sought to lease her unit, she submitted a personal financial statement that identified her annual income from A+ Teaching Supplies as $25,000 per year, and also stated that her husband's annual income was $170,000. Reassured by McClain's substantial financial resources, the Charanians permitted her to lease the second largest unit in the shopping center. Subsequently, at a deposition in September 2004, Ted Charanian learned that McClain's husband had opened a small business and no longer earned $170,000 per year. In December 2004, McClain paid her rent in an unusual manner: she submitted two checks, only one of which was drawn on her business account.

In February 2005, Ted Charanian decided to open the Citi account to "get a better handle on, if possible, the economic viability of both current and prospective . . . [c]ommercial tenants." He explained his purposes to Citi's representative during phone conversations and filled out the Citi application in accordance with the representative's advice. In view of McClain's unusual rent payment and an apparent reduction in the number of her customers, the Charanians became concerned she would not be able to pay her rent. Ted

Charanian obtained the credit report, determined that McClain's credit was in good order, placed the report in his files, and "forgot about it."

In denying McClain's CCRAA claim, the trial court found that the Charanians had a legitimate business need for the report, and that McClain failed to show that Ted Charanian breached his agreement with Citi in obtaining the report. On appeal, McClain argues that the trial court erred as a matter of law in applying the CCRAA. She contends that the record establishes that Octagon obtained access to McClain's credit data in a manner "other than as provided in Section 1785.11" (§ 1785.19, subd. (a)(1), (2)), and that Octagon is subject to a civil penalty under the CCRAA. The crux of this contention is that because the credit report was indisputably obtained in connection with *a commercial transaction*, it is not a "consumer credit report," as defined in section 1785.3, subdivision (c), and thus falls outside the scope of section 1785.11.

This contention fails in the face of sections 1785.41 and 1785.42. Although the parties did not raise or discuss these provisions before the trial court, we will affirm the judgment on any ground properly supported by the record.[5] On appeal, "[w]e do not review the trial court's reasoning, but rather its ruling." (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 15 [68 Cal.Rptr.2d 837].) Thus, we may affirm the trial court's ruling "on any basis presented by the record whether or not relied upon by the trial court." (*Day v. Alta Bates Medical Center* (2002) 98 Cal.App.4th 243, 252, fn. 1 [119 Cal.Rptr.2d 606].)

In view of the trial court's findings and the undisputed facts, the credit report that Ted Charanian obtained falls within the definition of a " '[c]ommercial credit report' " in section 1785.42. The record establishes that the tenant on the lease was a commercial enterprise, namely, "Kelly McClain dba A+ Teaching Supplies," and that Ted Charanian obtained the credit report to determine whether McClain could meet her financial obligations under the lease.[6] The report was thus "provided to a commercial enterprise for a legitimate business purpose, relating to the financial status or payment habits of a commercial enterprise which is the subject of the report." (§ 1785.42.)

---

[5] We accorded the parties an opportunity to present supplemental briefs on the provisions in question.

[6] Although section 1785.42 does not provide a definition of "commercial enterprise," courts have generally concluded that the designation "d.b.a." in connection with an individual indicates that the individual operates a business and is liable for its obligations. (See *Providence Washington Ins. Co. v. Valley Forge Ins. Co.* (1996) 42 Cal.App.4th 1194, 1200 [50 Cal.Rptr.2d 192]; *Pinkerton's, Inc. v. Superior Court* (1996) 49 Cal.App.4th 1342, 1348–1349 [57 Cal.Rptr.2d 356], and the cases cited therein.) Accordingly, the term "commercial enterprise," as commonly understood, encompasses such individuals.

Because the report is exempt from the provisions of the CCRAA under section 1785.41, the trial court did not err in rejecting McClain's claim.[7]

■ Pointing to *Bakker v. McKinnon* (8th Cir. 1998) 152 F.3d 1007 (*Bakker*), McClain argues that the report obtained by Ted Charanian is not a commercial credit report because Citi does not characterize or identify itself as a commercial credit reporting agency. We disagree. In construing a statute, we look first to "the words of the statute, giving effect to their plain meaning. If those words are clear, we may not alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.]" (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1437 [35 Cal.Rptr.2d 155].) ■ The definition of a " '[c]ommercial credit report' " in section 1785.42 encompasses "any report" that has the specified features, but does not require such reports to originate from a self-designated commercial credit reporting agency. Moreover, subdivision (b) of section 1785.42 defines a commercial credit reporting agency as "any person who, for monetary fees, dues, or on a cooperative nonprofit basis, provides commercial credit reports to third parties." This definition identifies providers of commercial credit reports as commercial credit reporting agencies regardless of how they characterize themselves. In view of the plain language of section 1785.42, McClain's contention fails.

Additionally, *Bakker* is materially distinguishable. There, an attorney representing the plaintiffs in a dental malpractice action obtained credit reports on the defendant and his daughters in order to obtain information that would force the defendant to enter into a settlement. (*Bakker, supra,* 152 F.3d at pp. 1009–1011.) When the defendant and his daughters sued the attorney under the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.) (FCRA), the trial court found that the reports were consumer credit reports protected by the FCRA, and that the attorney had not obtained them for a legitimate business purpose. On appeal, the Eighth Circuit affirmed these determinations, and rejected the attorney's contention that the reports were not consumer credit reports because they had been obtained for what she characterized as a commercial purpose. (*Bakker,* at pp. 1011–1013.) Unlike *Bakker,* however, where the trial court found the attorney's repeated attempts to " 'dig up as much dirt' " as possible on the defendant constituted a " 'blatant attempt to extract a settlement,' " that " 'grossly crossed the line' " of proper litigation conduct (*id.* at pp. 1009–1011), here the trial court found that Ted Charanian had a legitimate business purpose in obtaining the reports to determine the continued financial viability of his commercial tenant. Moreover, unlike *Bakker,* where the attorney sought to use the information for purposes other than those agreed to (*id.* at p. 1012), here the trial court

---

[7] In view of the trial court's findings, we note that the CCRAA claim also fails even if the report constitutes a consumer credit report.

found McClain had not shown that Ted Charanian had violated his agreement with Citi. Finally, we note that *Bakker* involved the FCRA which, unlike the CCRAA, lacks provisions akin to sections 1785.41 and 1785.42, which define commercial credit reports and expressly exempt them from the CCRAA.

McClain also attacks the trial court's finding that she failed to show that Ted Charanian violated the Citi agreement. On this matter, she argues that Jimmy Yu testified that the Citi agreement obliged Ted Charanian to obtain McClain's written consent prior to obtaining her credit report, and that Ted Charanian conceded that he never acquired this consent.

The record does not support this contention.[8] Yu, Citi's custodian of records, testified that Citi had purged all its personal documents regarding Ted Charanian's account, that none of the documents from Citi's records admitted into evidence defined the terms of "tenant screening" that Ted Charanian had accepted, and that he did not know whether Ted Charanian had filled out the standard Citi agreement. He nonetheless testified that the standard Citi agreement required landlords "to get a consent or some kind of rental application" before Citi would run a report. In addition, Yu stated that after Ted Charanian obtained McClain's report, Citi repeatedly asked him to provide a consent form from McClain, and it terminated his account when he failed to provide it.

Ted Charanian testified that the Citi agreement admitted into evidence was not the one to which he had agreed. He also testified that he informed Citi of his purposes in opening the account, that he supplied all the documents they required to open the account, that Citi never asked him for a consent form from McClain and that he had learned that Citi closed his account only because McClain and her husband had been "harassing" Citi.

The trial court found that McClain had failed to show that Ted Charanian breached any of the terms of his agreement with Citi. In view of the testimony from Yu and Ted Charanian—including the latter's testimony that

---

[8] We review the trial court's findings for the existence of substantial evidence. (*Nordquist v. McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 561 [38 Cal.Rptr.2d 221].) On review for substantial evidence, "all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." (*Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384].)

he did not execute the standard Citi agreement—the trial court could reasonably infer that McClain never established the terms of the agreement. In sum, the trial court properly concluded that Octagon had not violated the CCRAA.[9]

## C. *Accounting*

McClain contends that the trial court erred in denying her request for a declaration that under the lease she is entitled to an accounting of her share of the common expenses. She argues that the express provisions of the lease, together with the implied covenant, oblige Octagon to permit her to examine its records to verify her share of the common expenses.

Regarding this claim, the record establishes that in February 2005, Octagon sent McClain a letter stating her share of the actual common expenses for the 2004 calendar year and her share of these expenses for the 2005 calendar year. When she requested "a reasonably detailed statement" regarding these expenses pursuant to the lease, Octagon provided a more elaborate description of the common expenses for the 2004 calendar year. McClain's husband responded to the statement in a letter dated April 7, 2005. Asserting that a landlord owed a fiduciary duty to a tenant, the letter questioned certain expenditures, disputed the need for others, and sought documentation beyond that verifying the actual expenses incurred. In addition, the letter requested permission for an auditor to examine Octagon's records and obtain answers to the questions raised in the letter. Octagon did not agree to the request. The trial court determined that neither the express language of the lease nor the implied covenant of good faith and fair dealing accorded McClain the right to such an audit.

For the reasons explained below, we conclude that McClain is not entitled to dispute the need for expenses or to audit Octagon's records. Rather, she is entitled only to disclosure of the documents supporting the Charanians' "reasonably detailed statement" of her share of the common expenses, for the limited purpose of verifying that the listed expenses were incurred and that the listed amounts are accurate. Octagon may fulfill this obligation in any reasonable manner it elects, as by providing copies of the relevant documents or permitting McClain to examine the originals.

█ On appeal, McClain argues only that the implied covenant supports her request for an accounting, and does not suggest that the lease imposes

---

[9] For the first time on appeal, McClain argued during oral argument that the credit report at issue constituted a consumer credit report under the CCRAA, and that the trial court erroneously determined that Ted Charanian had a legitimate business purpose (within the meaning of the CCRAA) in obtaining it. McClain has forfeited this contention. (See *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [76 Cal.Rptr.2d 457].)

fiduciary duties upon Octagon regarding the common expenses. Generally, the implied covenant operates to protect the express covenants or promises of the contract. (*Racine & Laramie, Ltd. v. Department of Parks & Recreation, supra,* 11 Cal.App.4th at pp. 1031–1032.) " 'In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.' " (*Ibid.,* quoting *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1153 [271 Cal.Rptr. 246].) Accordingly, it imposes " 'not only . . . upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose.' " (*Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4th 1089, 1093 [8 Cal.Rptr.3d 233], quoting *Harm v. Frasher* (1960) 181 Cal.App.2d 405, 417 [5 Cal.Rptr. 367].) Nonetheless, because it protects only the express terms of the agreement, "[i]t cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 349–350 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) The precise nature and extent of the duties imposed under the implied covenant thus depend upon the purposes of the contract. (*Foothill Properties v. Lyon/Copley Corona Associates* (1996) 46 Cal.App.4th 1542, 1551–1552 [54 Cal.Rptr.2d 488].)

 California courts have long recognized that when two parties enter into an agreement for the sharing of profits that accords one party exclusive access and control over financial records bearing on the profits, the implied covenant accords the other party the right to an accounting of the profits. In *Nelson v. Abraham* (1947) 29 Cal.2d 745, 747 [177 P.2d 931] (*Nelson*), the defendant, who manufactured ice, entered into a profit-sharing agreement with the plaintiff. Under the terms of the agreement, the plaintiff was to sell ice for the defendant in San Francisco in exchange for one third of the net profits from his sales operation; the plaintiff otherwise acquired no interest in the defendant's business. (*Ibid.*) When the defendant sold his business, including the San Francisco operation, to a third party, the plaintiff filed an action for an accounting and division of profits. (*Id.* at p. 749.) The trial court determined that the parties had not formed a partnership or joint venture and rejected the plaintiff's claim for an accounting. (*Id.* at p. 747.)

 In reversing, our Supreme Court concluded that under the circumstances, the implied covenant obliged the defendant to provide an accounting, even if the agreement did not create a partnership or other form of fiduciary relationship. (*Nelson, supra,* 29 Cal.2d at p. 750.) It reasoned: "[U]nder an agreement calling for a division of profits, whether the contract is one of copartnership, joint venture, or employment, good faith and fair dealing

require that neither party may be permitted to take an unfair advantage or enjoy greater rights than called for by the terms of the agreement. One may not obtain a secret profit or undue benefit. The one who is entrusted with the rights of another is charged with the duty of guarding those rights with the utmost good faith. [Citations.]" (*Id.* at p. 751.)

In a later case, *Waverly Productions, Inc. v. RKO General, Inc.* (1963) 217 Cal.App.2d 721, 724–725 [32 Cal.Rptr. 73] (*Waverly*), two corporations entered into a motion picture distribution agreement that obliged them to share profits, but granted one of the corporations exclusive rights to sell the rental rights to the motion picture in other countries. Without mentioning *Nelson*, the court in *Waverly* concluded that although the agreement did not create a fiduciary relationship, the trial court had properly required the corporation in exclusive control of the rental rights to provide an accounting. (*Waverly*, at p. 731.)

In *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 31–33 [130 Cal.Rptr.2d 860] (*Wolf*), the court endorsed and explained the holding in *Nelson*. There, the author of a novel entered into agreements with an entertainment corporation to share the profits from a movie and related merchandise based on the novel. (*Wolf*, at pp. 27–28.) The agreements expressly accorded the author the right to an accounting. (*Ibid.*) After a dispute arose, the author initiated an action against the entertainment corporation, asserting, inter alia, a claim for breach of fiduciary duty. (*Ibid.*) When the trial court sustained a demurrer to this claim without leave to amend, the author sought relief by petition for writ of mandate. (*Id.* at p. 29.)

In rejecting the author's contention that the parties' agreements created a fiduciary relationship, the court in *Wolf* acknowledged the continuing vitality of *Nelson*: "The duty to provide an accounting of profits under the profit-sharing agreement in *Waverly* is appropriately premised on the principle, also expressed in *Nelson,* that a party to a profit-sharing agreement may have a right to an accounting, even absent a fiduciary relationship, when such a right is inherent in the nature of the contract itself. As the court in *Nelson* observed, the right to obtain equitable relief in the form of an accounting is not confined to partnerships but can exist in contractual relationships requiring payment by one party to another of profits received. That right can be derived not from a fiduciary duty, but simply from the implied covenant of good faith and fair dealing inherent in every contract, because without an accounting, there may be no way ' "by which such [a] party [entitled to a share in profits] could determine whether there were any profits . . . ." ' " (*Wolf, supra,* 107 Cal.App.4th at p. 34, quoting *Nelson, supra,* 29 Cal.2d at p. 751.)

In our view, the principle asserted in *Nelson* also encompasses the cost-sharing provisions of the lease. Like the courts in *Nelson, Waverly* and *Wolf,* we see no basis in these provisions for concluding that the lease imposes fiduciary duties upon Octagon regarding the common expenses. (See also *Korens v. R. W. Zukin Corp.* (1989) 212 Cal.App.3d 1054, 1058–1059 [261 Cal.Rptr. 137] [lease term requiring tenant to make security deposit does not impose fiduciary duty on landlord].) The lease obliges the parties to share the common expenses of the shopping mall, as enumerated in the lease, but accords Octagon exclusive management and control over those expenses while requiring it to provide McClain with a reasonably detailed statement of the expenses. Because McClain's share of the common expenses under the lease is determined by the *actual expenses* incurred by Octagon, she is entitled to verify that such expenses were, in fact, incurred and that the listed amounts are accurate. Accordingly, if requested, Octagon must provide McClain with the documents it used in preparing the "reasonably detailed statement"; to hold otherwise would necessarily " 'frustrate[] [McClain's] rights to the benefits of the contract.' " (*Racine & Laramie, Ltd. v. Department of Parks & Recreation, supra,* 11 Cal.App.4th at pp. 1031–1032, quoting *Love v. Fire Ins. Exchange, supra,* 221 Cal.App.3d at p. 1153.) Octagon may discharge this obligation in any reasonable manner it selects, including providing McClain with copies of the pertinent documents or giving her an opportunity to view the original documents.

In so concluding, we do not suggest that McClain's limited right to the documents underlying the "reasonably detailed statement" accords her greater control over the shopping center and its management than authorized by the express terms of the lease.[10] As our Supreme Court explained in *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc., supra,* 2 Cal.4th at page 374, " '[a]s to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct.' " (Quoting *VTR, Incorporated v. Goodyear Tire & Rubber Company* (S.D.N.Y. 1969) 303 F.Supp. 773, 777–778.) We hold only that Octagon may not prevent her from examining the records supporting its statements regarding actual common expenses incurred.

---

[10] McClain's requested audit, as described in the letter dated April 7, 2007, far exceeds the access to Octagon's documents authorized by the principles we have articulated. Under our holding, McClain is entitled to have Octagon produce the records to confirm the figures in the statement it provided her regarding her share of the common expenses; she is not entitled to demand explanations of Octagon's decisions to incur common expenses or to challenge these decisions. The record discloses that Ted Charanian was prepared to give McClain cancelled checks verifying the expenditures set forth in the detailed statement. It thus appears that McClain's claim for declaratory relief on this matter would have been unnecessary had she asked only for an opportunity to see the documents underlying the statement provided to her.

## DISPOSITION

The judgment is reversed solely with respect to McClain's claims for misrepresentation, an accounting, and declaratory relief, and the matter is remanded for further proceedings in accordance with this opinion. The judgment is otherwise affirmed in all other respects. The parties are to bear their own costs on appeal.

Willhite, Acting P. J., and Suzukawa, J., concurred.

Respondent's petition for review by the Supreme Court was denied April 30, 2008, S161718.