Filed 12/12/19 (after filing of partially published opinion on 12/12/19 (unmodified opn. attached))

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| ENA NORTH BEACH, INC., et al.<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>524 UNION STREET et al.,<br><br>    Defendants and Appellants. | A152431<br><br>(San Francisco County<br>Super. Ct. No. CGC-15-547922) |
| ENA NORTH BEACH, INC., et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>524 UNION STREET et al.,<br><br>    Defendants and Appellants. | A152937<br><br>(San Francisco County<br>Super. Ct. No. CGC-15-547922)<br><br>**ORDER MODIFYING OPINION<br>[CHANGE IN JUDGMENT]** |

**THE COURT**:

On the Court's own motion the opinion filed herein on December 12, 2019, is modified as follows:

On page 48, under the "**DISPOSITION**" heading, the first full paragraph is deleted, and the following sentence is added to read:  The judgment is affirmed.

Dated: _____                    _____

                                                                        Kline, P.J.

_____

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., A., B., C., D., and III.

1

Trial Court:                                    San Francisco County Superior Court


Trial Judge:                                    Hon. Richard B. Ulmer, Jr.


Attorneys for Plaintiffs and Appellants:        Wood Robbins
                                                B. Douglas Robbins
                                                Leyla M. Pasic
                                                Kelley A. Harvilla

Attorneys for Defendants and Appellants:        Kerr & Wagstaffe
                                                Wagstaffe, Von Loewenfeldt, Busch &
                                                Radwick
                                                James M. Wagstaffe
                                                Michael Von Loewenfeldt

                                                Draper Law Firm
                                                Ann McFarland Draper

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ENA NORTH BEACH, INC., et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>524 UNION STREET et al.,<br><br>    Defendants and Appellants. | A152431<br><br>(San Francisco County<br>Super. Ct. No. CGC-15-547922) |
| ENA NORTH BEACH, INC., et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>524 UNION STREET et al.,<br><br>    Defendants and Appellants. | A152937<br><br>(San Francisco County<br>Super. Ct. No. CGC-15-547922) |

After leasing premises owned by 524 Union Street for purposes of opening a restaurant, respondent ENA North Beach was unable to open because the San Francisco Planning Department determined that an existing conditional use authorization for the property was no longer effective and a new one could not be granted. ENA North Beach filed suit against the lessors, claiming false representations and failure to disclose material facts regarding the problems with the conditional use authorization. A jury found in favor of ENA North Beach and awarded compensatory and punitive damages. This appeal challenges the sufficiency of the evidence to support the jury's verdict. ENA North Beach's cross-appeal challenges the trial court's decision to reduce the amount of the punitive damages award against 524 Union Street. We conclude that the jury's

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., A., B., C., D., and III.

1

verdict on liability, including liability for punitive damages, is supported by substantial evidence. Although we conclude the trial court employed an improper procedural mechanism in reducing the amount of the punitive damages award, we affirm the judgment for the reasons explained herein.

## BACKGROUND

Natasha Hong, the president of ENA North Beach, sought to open a restaurant with a license to serve beer and wine in a building owned by 524 Union Street (524 Union), a space which had housed restaurants for many years. 524 Union is a general partnership, of which Beverly Smucha is the managing partner and her son, Barak Smucha, a partner.[1] Beverly estimated she had owned the property for 35 or 40 years. Prior tenants had operated under a conditional use authorization[2] for a "full-service restaurant and bar" obtained in 1998. Under the San Francisco Planning Code (Planning Code), a new full-service restaurant could be operated in this space only if there had not been a gap in operations of such a restaurant for more than three years, as the conditional use authorization would lapse if the approved use was discontinued for more than three years. (S.F. Planning Code, § 178, subd. (d).)[3] The continued validity of the existing conditional use authorization was critical to Hong's ability to open her restaurant because an ordinance adopted in 2012 prohibited approval of a new conditional use authorization

_____

[1] For convenience and clarity, this opinion will refer to Beverly Smucha and Barak Smucha by first name, no disrespect is intended. Unless otherwise indicated, arguments and positions attributed to Smucha are also those of 524 Union.

[2] As the terminology used in the testimony and documentary evidence varies, we note at the outset that this opinion will use the terms "conditional use authorization" and "conditional use permit" interchangeably.

[3] This section provides: "Abandonment. A permitted conditional use that is discontinued for a period of three years, or otherwise abandoned, shall not be restored, except upon approval of a new conditional use application pursuant to the provisions of Article 3 of this Code. For purposes of this Subsection, the period of nonuse for a permitted conditional use to be deemed discontinued in the North Beach [and] Castro Street Neighborhood Commercial Districts, and the Jackson Square Special Use District shall be eighteen (18) months[.]" (S.F. Planning Code, § 178, subd. (d).)

for a full-service restaurant in this location.  (S.F. Planning Code, § 780.3, subd. (c)(1) [North Beach Special Use District].)

The meaning of the term "full-service restaurant" was a matter of some dispute at trial.  According to the San Francisco Planning Department (Department) planner who testified at trial, under the applicable definitions in the Planning Code, a "restaurant" or "full-service restaurant" had to have "a majority of food service" but could also serve alcohol, while a "limited restaurant" would have no alcohol service.[4]  She testified, however, that the San Francisco Zoning Administrator interpreted the definitions as requiring that a full-service restaurant have a liquor license, so that a restaurant that did not serve alcohol would be a "limited restaurant."  Beverly maintained that a full-service restaurant was allowed to serve alcohol but not required to do so, and differed from a limited restaurant in that full service meant a sit-down restaurant while a limited restaurant was "more like a takeout place."

_____

[4] The San Francisco Planning Code (Planning Code) no longer uses the term full-service restaurant but rather contains definitions for "restaurant" and "restaurant, limited."  (S.F. Planning Code, § 102.)  A "restaurant" is defined a  "[a] Retail Sales and Service use that serves prepared, ready-to-eat cooked foods to customers for consumption on the premises and which has seating," and which "may provide on-site beer, wine, and/or liquor sales for drinking on the premises" if at least 51 percent of its gross receipts are from food prepared and sold on premises.  (*Ibid.*)  "Restaurant, limited" is defined as "[a] Retail Sales and Service Use that serves ready-to-eat foods and/or drinks to customers for consumption on or off the premises, that may or may not have seating" and "shall not provide on-site beer and/or wine sales for consumption on the premises, but may sell beer and/or wine for consumption off the premises . . . ." (*Ibid.*)  Examples of limited restaurants are "sandwich shops, coffee houses, pizzerias, ice cream shops, bakeries, delicatessens, and confectioneries . . . ." (*Ibid.*)

As described in the findings supporting the 1998 conditional use authorization, the then-existing provisions of the Planning Code defined "full-service restaurant" without reference to alcohol ("a retail eating or drinking use which serves food to customers primarily for consumption on the premises," "is not specifically designed to attract and accommodate high customer volumes or turnover," "has seating and serves prepared, ready-to-eat cooked foods for consumption on the premises," and where "[g]uests typically order and receive food and beverages while seated at tables on the premises and pay for service after the meal is consumed")  and separately defined "bar" ("a retail use which provides on-site alcoholic beverage sales for drinking on the premises").

Prior to ENA North Beach, a restaurant called Le Bordeaux had operated at 524 Union for part of 2011. Although Le Bordeaux had closed less than three years before ENA North Beach's tenancy, the Department concluded the conditional use authorization had lapsed for two reasons. One was that there had been a long gap between Le Bordeaux and the previous restaurant, The Field, which had a lease running through August 2008, but in fact left the premises in 2004. The second was that although Le Bordeaux had been approved as a full-service restaurant, the Department took the view that it did not operate as such because, while it had applied for a liquor permit from the state Department of Alcohol and Beverage Control (DABC), it had not actually received the permit before it ceased operating. As explained by the attorney Hong later hired to help her negotiate the permit issues, because the Department considered running a bar part of the approved use under the 1998 conditional use authorization, that authorization would lapse if there was a three-year period in which a bar was not run.

As will be explained, Hong initially obtained approval for her restaurant from the Department but that approval was subsequently rescinded after the gap in operations between The Field and Le Bordeaux was brought to the attention of the Department and the Department learned that Le Bordeaux had been operating without a liquor license. Unable to obtain approval to open the restaurant, ENA North Beach sued 524 Union and Beverly, alleging that Beverly falsely told Hong there had been full-service restaurants in the space "continuously," failed to disclose the more than three-year gap, and falsely represented that Le Bordeaux had an alcohol license.[5] Beverly maintained that she made all necessary disclosures regarding the history of the leased premises and that the Department interpreted the Planning Code incorrectly, an error Beverly could not have anticipated.

Hong testified that when she first visited the property in June 2014, Barak told her Le Bordeaux had a beer and wine license. She testified that Beverly told her there had

_____

[5] 524 Union filed a cross-complaint against ENA North Beach, Hong, and Arnold Bunyaviroch that is not at issue on this appeal.

4

always been a liquor license at the property, which had always been used as a full-service restaurant; never said Le Bordeaux did not receive a license to serve alcohol but rather said it obtained the license; never said the space had been abandoned or "discontinued" for three years, and never discussed the need for a conditional use permit. Before signing the lease, Hong went to the Department, asked the clerk whether there would be any problem opening a full-service restaurant at 524 Union and was told "no" and "everything is fine."

In mid-July 2014, Hong asked Beverly to delay the lease start date from August 1 until September 1, as she was looking for a wine and beer license broker to help her obtain a type 41 alcohol license and was not sure how long processing would take. Beverly agreed to the change in start date but said she could not delay signing the lease. Her email to Hong stated, "You should be able to get a type 41 liq. license (beer and wine) without a broker for a full-service restaurant. You will not be able to move forward with licensing without a fully executed lease." Because she was very busy, Hong hired the broker who had helped her when she opened her existing restaurant.

Hong signed the lease sometime on August 14, 2014. That afternoon, the broker emailed her, "[u]nfortunately, you are not allowed to obtain Liquor license, at all," attaching an email from the Department stating that, according to the zoning administrator, "the site will not be able to accommodate a new liquor license." Hong testified that this was a big deal because a restaurant cannot make a profit without selling alcohol. She contacted Beverly, who replied that evening, saying all of the prior tenants had had type 47 (hard liquor) licenses and the French restaurant was "approved for beer & wine." Beverly sent Hong a list of prior tenants from June 22, 1934, to October 7, 1999, describing all but one (in 1936) as "Bar & Restaurant," as well as some documents related to permits obtained by the tenants. Beverly told Hong she had delayed executing the lease and depositing Hong's check "because of your phone call," and suggested Hong take a few days to decide whether the space was right for her. Beverly subsequently signed the lease on August 17, 2014.

5

The lease states that "[t]he premises are to be used for the operation of a Restaurant, to serve food to the public as a Full Service Restaurant and alcoholic beverages of beer and wine. Lessee covenants and agrees with Lessor, as a condition of this lease, that the purpose of or use of the premises will not be changed or altered by Lessee without the prior written consent of Lessor. Lessee shall use said premises continuously and constantly during the term hereof for the purpose of conducting the above mentioned business."

On September 2, Department planner Marcelle Boudreaux signed a "Zoning Affidavit" to be submitted to the DABC for ENA North Beach, indicating the existing conditional use permit could be used and attaching the 1998 conditional use authorization.[6] Hong understood this form to be saying the previous tenant's conditional use permit remained valid, which was consistent with her understanding from her visit to the Department.

Around December 2014, Hong obtained the DABC beer and wine license. Renovations of the premises continued, with the aim of opening the restaurant around March 2015.

On January 20, 2015, planner Carly Grob emailed Hong that the Department "cannot approve the Dept. of Public Health or [DABC] referral for [ENA North Beach]. Planning Code section 780.3 states that a restaurant may be permitted as a conditional use if it does not occupy a vacant space last occupied by a permitted conditional use that has been abandoned or discontinued for 3 years. Because the former tenant, Le Bordeaux, never received a DABC license to serve alcohol, they were operating as a limited restaurant instead of a restaurant. Therefore, the restaurant use was abandoned more than 3 years ago, and cannot be reinstated at this location."[7]

---

[6] On the affidavit form, in a box for "date you filed application for C.U.P.," a handwritten note says, "N/A—can use existing conditional use Motion No. 14759/case 98.84."

[7] The issues with the conditional use permit were brought to the Department's attention by Marsha Garland, a permit expediter who had been involved in getting the

Hong emailed Beverly about the specified ordinance. Beverly responded, "[t]his came into effect because there were restaurants going into spaces that were previously other uses. [¶] [524 Union] has always been a restaurant bar; it's a 100 yr old space. This is not a new use but the same use for decades, and one of the oldest if not the oldest restaurant spaces in North Beach. [¶] Also they know Le Bordeaux has not been out of there for 3 years. They are just trying to come up with something else. Makes no sense. It will work out, just need to get to the right person. These planners need to be fired." A few days later Beverly told Hong, "The planner's opinion that Le Bordeaux became a limited restaurant because of the processing of his beer and wine license was delayed is incorrect."[8]

Hong hired attorney David Silverman to help her with the conditional use permit issues. On February 8, 2015, when Hong forwarded to Beverly an email from her attorney's office indicating that in order to fight the abandonment issue they would need "the use/lease/occupancy history of the building laid out, and all the efforts to try to find a tenant over the last several years that hopefully would toll the ticking of the abandonment clock," Beverly replied, "Doesn't sound like this attorney is up to speed with the laws. We will try to come up with some names."

In a March 12, 2015 email, Beverly told Hong that the premises had never been used as a limited restaurant but "always and only" full service, the insurance on the premises was for a full-service restaurant, "which is more expensive and difficult to get,"

---

conditional use approval for The Field in 1998. Garland testified that she told the owner of Le Bordeaux he needed a conditional use permit, told Beverly this, and during the time Le Bordeaux was operating, notified the Department that a conditional use permit was needed. Garland told the Department it had made a mistake with Le Bordeaux because the long prior vacancy meant a new conditional use permit was needed; she felt allowing it to open was unfair to others who were unable to get alcohol licenses.

[8] In this email, Beverly suggested that Hong point out to the Department that "the amendments adding a limited restaurant" would not apply to Le Bordeaux because they did not go into effect until May 2012 and Le Bordeaux was approved as a full-service restaurant in 2011, and in any event the definition of "restaurant" did not require having a liquor license.

and the previous tenant's insurance was for a full-service restaurant with a beer and wine license.

Silverman testified that Beverly told him The Field left in 2008 and gave him a copy of its lease, which stated a termination date of August 31, 2008. On this basis, Silverman argued to the zoning administrator that the gap between The Field and Le Bordeaux was less than three years. The zoning administrator found The Field's lease insufficient to demonstrate that it remained in operation until its termination date because the DABC website indicated The Field's licenses were cancelled in August 2004. Beverly told Silverman she thought the administrator was mistaken.[9] Based on Beverly's representations, Silverman prepared a declaration that she executed on March 16, 2015, stating that "the space has been used as a full-service restaurant and bar continuously after we obtained the conditional use authorization in 1998 except for periods of turnover between tenants, when we advertised for full-service restaurant tenants," and that "The Field Restaurant and bar was the Lessee under a Lease Agreement that was in effect from August 26, 1998 until August 31, 2008." The zoning administrator again found this was "not enough to substantiate that the conditional use was not abandoned."

Silverman testified that when he tried to get documentation from Beverly to refute the gap in operations between The Field and Le Bordeaux, she responded with statements about Le Bordeaux's liquor license application and arguments that the Department's determination was wrong.[10] At this point, Silverman was "starting to think that [the zoning administrator] might have a point because I'm not getting any evidence to the contrary."

---

[9] When Silverman's paralegal investigated, the information was no longer available on the DABC website.

[10] Among his attempts to provide the zoning administrator with facts to support the argument that there was a continuous use of the space, Silverman tried to show that the owner advertised for a tenant for the same purpose during times no restaurant was operating, but Beverly provided only two years of advertisements, which left a five-year gap.

In an April 2015 email correspondence, the zoning administrator informed Silverman that "any approval of Le Bordeaux in 2011 was in error" because the previous restaurant use had been abandoned after The Field discontinued operation in 2004. Silverman's requests for additional documentation from Beverly met with arguments that the department was acting improperly. The zoning administrator denied Hong's request for a hearing, and Silverman told Beverly they had reached a dead end.

Hong testified that she had believed everything Beverly told her about the use of the premises and realized Beverly "was lying to me from the beginning" only after her attorneys told her there was nothing more to be done and she would not be able to open the restaurant. She gave notice of termination of the lease on April 24, 2015. Asked why he believed, as stated in the termination letter, that Beverly "failed to disclose to [Hong] the existence of the abandonment of the conditional use for the premises," Silverman testified, "[b]ecause she had been telling me the opposite . . . [t]hat the restaurant had operated continuously . . . [a]s a full-service restaurant and bar." He testified, "the situation was actually worse than I wrote in this letter. I wrote that, 'You failed to disclose to our client existence of the abandonment.' [¶] Actually, she lied to our client about it because she told her over and over again that there had been continuous operation. And she told me that, and she told the zoning administrator that."

Planner Carly Grob testified that it initially appeared Hong's restaurant could be approved with the existing approval for restaurant use, but it was later discovered that Le Bordeaux had been operating as a limited restaurant, without liquor service, and the zoning administrator interpreted the Planning Code as requiring a restaurant to have an alcohol license. When Grob asked Beverly for documentation relating to use of the property, Beverly responded with complaints about the permit expediter who had complained about the conditional use issue (see fn. 7, *ante*, at p 6.) and assertions that Le Bordeaux had gone through a "very thorough" planning and zoning process to receive approval. Beverly never said there was a vacancy at the property. Grob testified that the Department had not revoked the September 2, 2014 zoning affidavit indicating Hong did

9

not need a new conditional use permit, but had "acknowledged" that position was incorrect and so advised the DABC.

Sylvain Castet, the owner of Le Bordeaux, testified that when he rented the premises intending to open a French restaurant serving beer and wine, Beverly did not tell him about a prior vacancy of more than three years or possible need for a new conditional use approval. After he signed the lease, neighbors told him the property had been vacant for 10 years. When he asked Beverly about this, she responded, "[n]o, it hasn't been vacant for 10 years" and advised him not to listen to the neighbors; she never told him there was had been a vacancy of more than three years.[11]

Optimist Prime, a company owned by James Bryant Bourque, his mother and his stepfather, signed a lease for the 524 Union premises on October 8, 2015, with the intention of opening a restaurant. For tax reasons, a contingency was being able to open by the end of 2015, and Beverly assured them she would make sure they got timely approvals to be able to meet the deadline. From his conversations with Beverly, Bourque understood they would need to go through the conditional use process but this would not stop them from opening the restaurant; Beverly did not disclose that zoning for this purpose had been lost entirely, did not mention a problem with a prior tenant or with ENA North Beach, and told him the owner of Le Bordeaux had received a liquor license but had to leave the country due to a visa issue before he was able to start using it. Beverly said the space had always been used as a restaurant and both she and the lease itself said it could only be used as a full-service restaurant. His understanding from Beverly was that the premises had been vacant because they were being selective about who to lease to, not because they were having trouble getting tenants.

Beverly provided Bourque with a written disclosure statement that stated the premises had "always" been used as a restaurant and had last been leased by ENA North Beach, which "did not get open"; that Beverly had been told it was "scheduled to open,

---

[11] Beverly claimed to have clarified that it was vacant for over three years but was not able to identify where she had said this.

10

with all approvals including the issuance of their beer & wine license," until expediter Marsha Garland, who represented competing interests, complained to the Department; and that ENA North Beach, "already in violation of her lease was unable to navigate the permitting process with their attorney and was adverse to the potential of a Conditional Use process, opting instead not to pursue the issue formally." The disclosure described Le Bordeaux as a full-service restaurant "specializing in Bordeaux regional wines," and stated that it "received the required approvals and permits from the city prior to opening" but processing of its beer and wine license was "delayed because of corporate issues" and "they got approved for issuance, however just prior, they had to close due to immigration visa issues." According to the disclosure, Garland and the Department had an issue with Le Bordeaux having been approved to open without going through the conditional use process, and the Department changed its interpretation of the definitions of types of restaurants and acted "as if Le Bordeaux had never opened and withdraw [*sic*] ENA's approval." The disclosure referred to the "discrepancy with the last tenant" and stated that the premises had "never been a dormant space."[12]

Bourque first learned there might be a problem from the owner of the restaurant next door. Although the Department initially said it looked like there should not be a problem opening "some kind of food service," an attorney alerted Bourque to the zoning issues, further inquiries at the Department revealed that The Field sold its liquor license to another enterprise in 2004, and Bourque learned they would be able to open only with a special exemption from the supervisor of the district, who was a proponent of the special use district trying to limit restaurants in North Beach.

---

[12] Bourque's understanding from the disclosure was that the liquor license for Le Bordeaux had been issued and ENA North Beach terminated its lease because of disagreements over "tenant improvements, and decorations, paint and that kind of thing" and "for whatever reason, they couldn't get their permitting . . . ." He understood the reference to "dormant space" as saying there had been continuous operation of a full-service restaurant with no lapse, and Beverly never discussed a period of dormancy following The Field or a gap of three years or more between The Field and Le Bordeaux.

Bourque testified that Beverly told his mother about the present lawsuit about four days after the lease was signed but said it would not impact Optimist Prime; they came to realize the suit was linked with the zoning issues and gave notice of termination of the lease on October 31, 2015. Bourque denied Beverly's claims that they terminated the lease because she would not approve unpermitted work they wanted to do on the premises and that they damaged the premises.

Grob testified that it seemed the landlord was continuing to market the space as a restaurant because she continued to get calls from prospective tenants seeking to open a restaurant there; she would tell them that they could not do so, in accordance with the Department's "practice and opinion" that the space cannot be used as a full-service restaurant and bar.

Beverly testified that when Hong first contacted her about the premises, she did not believe a conditional use permit would be needed because the previous tenant had been approved without a new one, there was still a conditional use permit recorded against the property, and her understanding was that the permit would have to go before the San Francisco Planning Commission to be revoked. The 1998 conditional use authorization included the statement that a "full-service restaurant and bar previously existed at the Project Site, but has been closed for over three years. Per Planning Code Section 178(d), conditional use authorization would not be required had the business been closed for less than three years." Asked about her awareness of this point in 1998, Beverly testified that she did not know whether the new authorization was required because of "the three years or it was a different kind of business or a different kind of liquor license."

Beverly acknowledged there was "at least" a three-year gap between The Field and Le Bordeaux, as The Field vacated before the end of its lease. She testified that "[p]robably all of North Beach" knew about The Field vacancy. Asked why she did not disclose it, Beverly said, "[t]here was nothing to disclose" and "we disclosed everything." She denied having suggested to Grob that the vacancy period was less than three years and testified that she did not correct the misunderstanding reflected in an email

12

suggesting she had done so[13] because she was "trying to figure out what was going on because they had approved Le Bordeaux and they approved Hong," and she was shocked that the city was "going back to a previous tenant" after having approved Le Bordeaux. She denied knowing that a three-year gap in use would jeopardize the conditional use permit or representing to other people that the property did not have a vacancy of at least three years.[14]

Asked about the statement in her declaration that the space had been used "continuously" as a full-service restaurant and bar since the conditional use authorization in 1998, she testified that her understanding of "continuously" was "repeatedly," the statement was true "except for the time when it was vacant," and the use of the space was never changed. Beverly believed a conditional use authorization would not lapse if the owner did not intend to abandon the use, a view she believed to be supported by a 2004 letter of determination by a previous zoning administrator which she described as concluding there was no abandonment of a conditional use permit where "the owner's intention is to find a replacement tenant for the same use."[15] She testified that her

---

[13] Grob's email to Beverly stated, "From our earlier discussions, I believe that the period of vacancy between Le Bordeaux and the preceding restaurant was less than three years and no CU is required, but I simply do not have documentation to prove it. Any documentation you may have would be very helpful."

[14] In her deposition, asked whether she had any reason to think a 2009 article was incorrect in stating that the space had been vacant "for years," Beverly initially claimed she did not understand the question, then questioned what the author knew about the situation and said she had "no idea," then, after acknowledging she was sure it was vacant in 2009, said, "everybody has their own conception of years. . . . Some people think six months are years. Some people think ten years are two years . . . ."

[15] The 2004 case involved a restaurant called Basta Pasta that closed in 2001. Based on the facts that the restaurant furnishings and equipment had been kept in place and the business and property had been marketed as a unit, the zoning administrator determined that there had been a "generally consistent effort to operate the subject property as a restaurant" and the use had not been abandoned for purposes of the conditional use authorization. The determination letter noted the "difficult economic conditions following the collapse of the dot com industry, and the ensuing loss of numerous restaurants throughout the city," and stated that "[t]o consider a use abandoned

13

declaration was meant to prove there was no three-year abandonment, and denied that it was misleading to say The Field was the lessee under an agreement that was "in effect" until August 31, 2008, when The Field had left before the end of the lease term.

Asked about the email in which she told Hong that Le Bordeaux had been "approved for a type 41 liquor license," Beverly testified that she meant the owner was "approved with the city as a full-service restaurant to operate with a Type 41 liquor license," but acknowledged that the city does not issue liquor licenses and that the owner closed the restaurant "prior to the final issuance and approval" of a liquor license.

Beverly denied having a disclosure problem with Optimist Prime; denied that the written disclosure statement failed to disclose that ENA was not able to use the 1998 conditional use authorization or get a new one; denied that saying the premises had "never been a dormant space" was intended to communicate that there were no vacancy issues; and claimed to have discussed the issues about The Field with the lessees when they first looked at the space. Beverly testified that Optimist Prime left because she would not approve plans for unpermitted alterations of the space; asked whether the real reason was that the lessees discovered they would not be able to open a full-service restaurant and bar because of the issues Hong had, Beverly responded, "that's what they said. However, we were very suspicious that maybe we were set up in them coming in at some point."

Barak testified that when he first showed Hong the space, she knew about Le Bordeaux and asked "how he survived being a French restaurant without the liquor license," and that he discussed with Hong the problem of The Field having left before the end of its lease and told her, as he tells everyone, there had been a three- or four-year vacancy before Le Bordeaux. He testified that Castet knew about the "three- to four-year" vacancy prior to Le Bordeaux and denied that the contrary was indicated by an email in which Castet said he needed to know the departure date of the last tenant

because it was unable to be leased in light of consistent efforts to rent the space, would damage the city's ability to recover from economically troubled times."

14

because the Department needed to know if it was less than three years so he could be allowed "a 'continuation of existing use.' "

Barak testified that when he first showed the space to Bourque, he gave his "usual" disclosure speech, so "they knew going in that there were unresolved zoning issues," but they "weren't really that interested" and said they had a contact at a lobbyist firm. He told Bourque that the Department was misreading a law and there was more to be done to deal with the issue. He denied having been told Bourque had a definite timeline for opening his restaurant and claimed they would not have leased to him if he had, denied that Bourque was told a beer and wine license had been issued to Le Bordeaux, and stated that Bourque wanted to do extensive unpermitted work on the space. Barak testified he still believed there will be a restaurant with a liquor license in the space, as neighboring properties with long vacancies had gotten licenses in same time period.[16]

The jury returned verdicts in favor of ENA North Beach on the claims for intentional misrepresentation, concealment, and breach of the implied covenant of good faith and fair dealing, and found damages of $91,692.50, and clear and convincing evidence that Beverly acted with malice, oppression or fraud. The jury found in favor of

---

[16] Commercial Real Estate Broker Steve Zimmerman, testifying for Beverly, opined that Hong did not satisfy "the standard due diligence usually implemented by a buyer in a project such as this" and that Hong's signing the lease on the day she had been told there would be no liquor license available "doesn't seem like a very sound decision." He testified that the Zoning administrator's statement should have been a red flag that investigation was needed; he would have recommended a client obtain counsel from a permit attorney or DABC attorney; Hong should have hired her land use attorney before she signed the lease rather than afterward; and it was not reasonable for her to rely on the statements of her landlord or broker. Given that there was an existing conditional use permit that had not been removed and a preexisting tenant who was allowed to open without a new conditional use permit, he did not think the landlord had an obligation to disclose more than these facts, because it would be logical for the owner to think the conditional use permit would still be valid. He acknowledged that his analysis assumed there was no fraud or deceit by the landlord toward the tenant, but testified that such fraud or deceit would not change the requirement for the prospective tenant to do due diligence.

15

Beverly on Ena North Beach's claim for breach of contract. The jury subsequently awarded punitive damages against 524 Union in the amount of $916,925 and against Beverly personally in the amount of $91,692.50. After the court entered judgment on the jury's verdict, Beverly filed motions for judgment notwithstanding the verdict (JNOV) and for a new trial. The trial court denied the new trial motion, granted the motion for JNOV in order to reduce the award of punitive damages against 524 Union to $131,500, and denied the motion in all other respects. The court granted ENA North Beach's motion for attorney fees in the amount of $401,584 ($385,874 for fees accrued up to entry of judgment and $15,710 for fees accrued after entry of judgment), and subsequently granted a supplemental motion for attorney fees in the amount of $75,537. The final judgment was filed on August 28, 2017. This appeal and cross-appeal followed.

## DISCUSSION

### I.

Beverly challenges the sufficiency of the evidence to support the jury's verdict. In resolving this issue, "[a]ll conflicts in the evidence are resolved in favor of the prevailing party, and all reasonable inferences are drawn in a manner that upholds the verdict. (*Greathouse v. Amcord, Inc*. (1995) 35 Cal.App.4th 831, 836–837, citing *Crawford v. Southern Pacific Co*. (1935) 3 Cal.2d 427, 429.)" (*Holmes v. Lerner* (1999) 74 Cal.App.4th 442, 445.) "All issues of credibility are likewise within the province of the trier of fact." (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925.)

### A.

The theory of Hong's case was that she was fraudulently induced to enter the lease agreement. " 'The necessary elements of fraud are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage.' " (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1108; see *Seeger v. Odell* (1941) 18 Cal.2d 409, 414; § 1709.)" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 (*Alliance Mortgage*).)

16

Beverly contends there was no substantial evidence to support the jury's verdict for intentional misrepresentation in that there was no evidence of any misrepresentation made *before* the lease was signed. According to Beverly, Hong's attorney argued in closing that evidence of statements made *after* the lease was signed allowed an inference that similar statements were made and relied upon prior to signing, an argument Beverly maintains improperly called for speculation absent evidence of any such statements having been made. (*California Shopper, Inc. v. Royal Globe Ins. Co*. (1985) 175 Cal.App.3d 1, 45 [finding of fact must be based on evidence, not speculation].)

Beverly's characterization of this portion of the argument is not accurate. Counsel argued that Hong testified to statements she relied upon in signing the lease, and that evidence of statements made after the lease was signed was relevant *in addition* to Hong's testimony because it showed "how [Beverly] is talking. It's consistent that, if you make misrepresentations before the lease is signed, you continue to make those same misrepresentations after the lease is signed."[17] Counsel did not argue that because there

_____

[17] Counsel argued: "Some of the statements you've seen on the board this afternoon, many of these statements happened after the lease was signed. And you may be asking yourself, wait a second. How could [Hong] be relying on statements made after the lease was signed when we're alleging she was induced to sign the lease by way of these false statements? Right? [¶] Hong testified credibly that she did rely on false statements, orally, and she testified credibly that [Beverly] said the property was used continuously. This is beyond the e-mails you looked at. This is what she testified to hearing before, before she signs the lease. [¶] Beverly said the property was used continuously without interruption. Hong testified that Beverly said the property could be used as a full-service restaurant serving alcohol. No problem. Somewhat reminiscent of what Barak said. He says to the tenants, 'You can get a conditional use permit, not problem.' [¶] Hong said Beverly advertised— the advertisement on Craigslist said it could be used as a full-service restaurant serving alcohol and that Beverly discussed Le Bordeaux and represented that Le Bordeaux had an alcohol license. These are all the things [Hong] says was said to her before the lease was signed. . . . The point of the later e-mails is just to show that this is how Beverly is talking. It's consistent that, if you make misrepresentations before the lease is signed, you continue to make those same misrepresentations after the lease is signed. And because we don't have perfect evidence of what happened before the lease is singed, we use the gestalt, the whole body of evidence together, to allow us to reasonably infer what happened here. [¶] And even Beverly . . . admits that, prior to signing the lease, Hong asked extensively about the

17

was evidence of false statements made after the lease was signed the jury could conclude such statements were also made before the signing.

Hong testified that when she first visited the property, Barak told her that Le Bordeaux was a "bar," "they must have had a lot of beer piping going upstairs" and "they had a beer and wine license."[18] She testified that Beverly told her the property had always been a full-service restaurant and there had always been a liquor license at the property; never said Le Bordeaux did not receive a license to serve alcohol but rather said it obtained the license; and never said the space had been abandoned or "discontinued" for three years.

Beverly points out that Hong first met Beverly *after* the lease was signed and Hong acknowledged on cross-examination that she asked Beverly about the restaurant prior to Le Bordeaux only after Hong signed the lease. Beverly points to this acknowledgment in arguing that Hong was "unable to identify a single misrepresentation" made to her prior to signing the lease, noting that when specifically asked what "lie" Beverly told her, Hong responded that when she asked about the restaurant before Le Bordeaux, Beverly said, "Oh, it's very complicated. I don't want to go there."

Immediately after acknowledging that this conversation occurred after the lease was signed, however, Hong testified, "But she didn't mention anything about prior tenant." Beverly's attorney pressed, "you didn't ask her, did you?" and Hong replied, "Yeah, because I trust her word, '[t]here's always been full-service restaurant with a beer and wine license.' Why would I question her—question her period? Because landlord told me it's always been a full-service restaurant. I trusted her. I believed her because, if I were the landlord, I would not lie. I would not, not tell the truth." Hong expressly

---

history of the building" and Beverly said, "There was nothing to disclose. We disclosed everything."

[18] Beverly notes Hong's testimony that when Barak showed her the property, they "didn't really discuss a lot of things," but she ignores what Hong testified they did discuss during this visit.

18

testified that at the time she signed the lease she believed it could be used as a full-service restaurant because "[Beverly] told me that it's always been a full-service restaurant, and I believed it." Hong also testified that when she signed the lease, Beverly told her "there was an existing beer and wine license." When asked on cross-examination to acknowledge, in accordance with a provision in the lease agreement, that Beverly "didn't make any warranties or representations about the fitness of the premises for the use that you wanted," Hong responded, "She did. She told me that it was a full-service restaurant and is selling liquor license—I mean alcohol type 47 and a beer and wine license." [19]

Hong's testimony was substantial evidence supporting the jury's verdict. Additional support was provided by evidence of email correspondence around the time Hong entered the lease. As previously indicated, on the day Hong signed the lease, the broker she had hired informed her that she would not be able to "obtain Liquor license, at all" and sent her the Department's email stating that, according to the zoning administrator, "the site will not be able to accommodate a new liquor license." Upset, because a restaurant cannot make a profit without selling alcohol, according to Hong's testimony, she forwarded the email to Beverly, who replied at 10:40 p.m., saying she was sending separate emails with "records of usage as a Bar & Restaurant," and that "[a]ll of them had a type 47 hard liq. License" and the French restaurant was "approved for beer & wine." [20] Beverly included a two-page list of building permit records for the premises,

_____

[19] Beverly maintains that the sole "relevant communication" from her to Hong prior to the lease signing was an email stating, "You should be able to get a type 41 liq. License (beer and wine) without a broker for a full service restaurant." Beverly maintains this was a statement of opinion rather than an actionable misrepresentation. (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 158 [" '[P]redictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud.' "].) This is not one of the specific statements Hong relies upon as supporting the verdict. It is worth noting, however, that in the context of this case it could reasonably be seen as further evidence that Beverly was attempting to obfuscate issues she knew existed with regard to the conditional use permit.

[20] Beverly testified that she was not sent the emails between the broker and Hong and first saw them during production of documents in the litigation. She testified that

indicating owners and usage by all but one as "Bar & Restaurant," beginning with June 22, 1934, and ending with an October 7, 1999, record for The Field. This list did not include subsequent records for the Field in 2003 and Le Bordeaux in 2011 that were included in the version of the list Beverly produced in discovery, and Hong argued at trial that the omission of page 3 from the document Beverly sent Hong was an attempt to hide the period of inactivity between The Field (1999) and Le Bordeaux (2011). Beverly denied this and testified the omission was unintentional,[21] but the jury was entitled to draw the inference against Beverly if it did not find her credible.

Beverly argues there was no evidence Hong saw this email before signing the lease on August 14, 2014. But this ignores the context. Beverly's 10:40 p.m. email went on to say, "I have delayed executed [*sic*] the Lease yet or deposited your check because of your phone call. The space may not be right for you. [¶] Please take a few days to think about it. I will get your check back to you right away. I will wait to hear from you." This email may or may not have induced Hong's initial signing, but it definitely preceded actual execution of the lease, which did not occur until Beverly signed it on August 17, 2014. The email offered Hong an out, telling her the lease was not yet effective, and thus could be viewed as inducement for Hong to proceed with the lease after she expressed concerns.

Beverly also argues that the representation that Le Bordeaux was "approved for beer & wine" was true. This may be technically correct: The license had been approved but not issued. Hong testified that she understood the email as assuring her Le Bordeaux had a liquor license, that the documents attached to the email were supposed to show

---

Hong called her on August 14 about having reservations about the lease but did not mention the Department saying she would not get a license, only that Hong said she had "contacted some nonprofit organization and they had submitted it and then she got this email saying that it would be tough in North Beach."

[21] Beverly testified that there were two versions of this document because she added Le Bordeaux and its approval to update the summary, and the omission of the third page from the email to Hong was not intentional. She denied failing to send it because the entries on page three would have suggested there was no activity at the property between 2003 and 2011.

"that previous restaurant, except Le Bordeaux, they all had Type 47 liquor license" and "also according to her, Le Bordeaux has Type 41 beer and wine license." Since the critical question was whether the restaurant in fact had a liquor license, the representation was at best misleading, implying that the restaurant actually had a license despite not expressly saying so, and the jury could reasonably accept Hong's understanding.[22]

Beverly further contends the evidence does not support a finding of justifiable reliance. "A plaintiff establishes reliance 'when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction. [Citations.]' (*Alliance Mortgage, supra,* 10 Cal.4th at p. 1239; see CACI No. 1907 (2013 ed.) [reliance shown if misrepresentation, concealment or false promise 'substantially influenced' plaintiff and he or she 'would probably not have' acted absent it]." (*Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1193 (*Hoffman*).)

"After establishing actual reliance, the plaintiff must show that the reliance was reasonable by showing that (1) the matter was material in the sense that a reasonable person would find it important in determining how he or she would act (*Charpentier v. Los Angeles Rams Football Co.* (1999) 75 Cal.App.4th 301, 313); and (2) it was reasonable for the plaintiff to have relied on the misrepresentation. (*Blankenheim v. E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1475; see CACI No. 1908 (2013 ed.).)"

---

[22] Beverly suggests that the absence of misrepresentations before the lease was signed is demonstrated by correspondence from Hong's attorney to the Department in March 2015 that made "clear that Hong's reliance was 'based entirely' on the Planning Department's statements and written approvals." Silverman's letter to the Department argued that both Hong and Beverly would be irrevocably harmed by revocation of the conditional use approval and requested a public hearing if the Department was not going to honor the prior approval and DABC license Hong had obtained. Hong was attempting, at that point, to resolve the problem by convincing the Department to change its position, a solution that would have been to Beverly's benefit as well as Hong's. Beverly does not explain how Silverman's statement in this context, or an email to similar effect, amounted to a binding declaration that no misrepresentations had been made by Beverly prior to execution of the lease.

*(Hoffman, supra,* 228 Cal.App.4th at p. 1193.). " 'Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent.' " (*Alliance Mortgage, supra,* 10 Cal.4th at pp. 1239–1240, quoting *Seeger v. Odell*, *supra*, 18 Cal.2d at p. 414 (*Seeger*).) But "a plaintiff's particular knowledge and experience should be considered in determining whether the reliance upon the misrepresentation or nondisclosure was justified. ([*Alliance Mortgage*,] at p. 1240, ; see CACI No. 1908 (2013 ed.).) 'If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable . . . he will be denied a recovery.' " (*Hoffman,* at p. 1194, quoting *Seeger,* at p. 414.)

Beverly argues that Hong already owned a restaurant and was familiar with "the required approvals"; that she was expressly informed by her broker that the Department would not approve an alcohol license for the new restaurant yet did nothing to investigate further, despite Beverly urging her to take a few days to think about whether the space was right for her; and that the lease contained disclaimers stating that "the property was being provided 'as is,' without any representations, and recognizing that approvals might not be obtained."[23]

---

[23] Beverly points to the following provisions of the lease:

Paragraph 3A provides, "Lessee acknowledges that no warranties or representations have been made by Lessor or its agent regarding the fitness or suitability of the premises for the conduct of Lessee's business, and Lessee has made its own independent investigation to determine the fitness and suitability of the premises for its use."

Paragraph 4B provides, "In consideration of Lessee's intended tenant improvements which includes restoration and renovation of the premises . . . Lessor agrees that the Base Rent shall be abated during the first three (3) months of the term of the Lease; only if required to obtain necessary permits and licenses from State and City Agencies, and as consideration for time needed during the build-out and construction time, and to obtain final approval for a Beer and Wine On Sale License" from DABC. This paragraph provides for an additional abatement period at the sole discretion of the lessor if after the first three months "the issue of a 'On Sale Beer and Wine Liquor License' has not been approved and has been delayed due to State and City Agencies, or the buildout process has been delayed due to State and City Agencies. . . ."

Such disclaimers in a contract "do not operate to insulate defrauding parties from liability." (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 393; *McClain v. Octagon Plaza, LLC* (2008) 159 Cal.App.4th 784, 794–795 (*McClain*).) "It is well-established in California that a party to a contract is precluded under section 1668 from contracting away his or her liability for fraud or deceit based on intentional misrepresentation." (*Manderville v. PCG&S Group, Inc.* (2007) 146 Cal.App.4th 1486, 1500 (*Manderville*).)[24] A party may claim fraud in the inducement of a contract

---

Paragraph 5A provides for return of the remaining balance of the lessee's security deposit if the lessee is "unable to obtain approval of issuance of a 'On Sale Beer and Wine' Liquor License to the Premises" from the DABC after good faith efforts to do so and "has elected to terminate the Lease and vacate the premises accordingly."

Paragraph 15A provides, "Lessee accepts the premises 'AS IS' and "Where is' with any and all faults, in their present condition, including, but not limited to physical conditions of the premises; and zoning, planning, conditional uses, or other regulatory conditions that may effect the use of the Premises in any way; and any conditions within the neighborhood in which the Premises are located. Lessee acknowledge and confirm that they have inspected and researched the Premises, and any potential issues or conditions, or had reasonable opportunity to do so, and have no claim whatsoever against Lessor or their representative for any claim related to the condition of the Premises, or their suitability for Lessee purposes. Lessee expressly acknowledges that they have not relied upon representations as to the conditions of the Premises."

Paragraph 27 provides, "It is expressly agreed between Lessor and Lessee that there is no verbal understanding or agreement which in any way changes the terms, covenants and condition herein set forth, and that no modification of this lease and no waiver of any of its terms and conditions shall be effective unless made in writing and duly executed by the authorized officers of the necessary parties or party or directly by Lessor and Lessee."

Paragraph 28 provides, "Lessee acknowledges that they have received no representations or advice from Lessor or their representatives, and by execution below, each of the parties hereby acknowledges that all parties had reasonable opportunity to review this agreement with Legal Counsel, and or other advisors . . . Lessee is solely responsible and using due diligence in acceptance of all terms and conditions of the Lease."

[24] Civil Code section 1688 provides, " 'all contracts which have for their object, directly or indirectly, to exempt *anyone* from responsibility for his own *fraud*, or willful injury to the person or property of another, or violation of law, whether willful or

23

containing a provision disclaiming any fraudulent misrepresentations and introduce parol evidence to show such fraud." (*Hinesley v. Oakshare Town Center* (2005) 135 Cal.App.4th 289, 301 (*Hinesley*).)  Disclaimers in a lease may put a lessee "on notice to ask further questions," however, and they are a factor to consider in determining whether reliance on the lessor's representations was reasonable.  (*Id.* at p. 302.)

*Hinesley* involved a lease for commercial space in a shopping center:  The lessee alleged that the lessor's agent falsely represented that certain major stores would be opening in nearby spaces by a specified date, and that it relied upon these representations in entering its lease.  (*Hinesley, supra,* 135 Cal.App.4th at p. 292.)  The contract stated, "Lessee does not rely on the fact nor does Lessor represent that any specific Lessee of [*sic*] type or number of Lessees shall during the term of this Lease occupy any space in the Shopping Center."  (*Id.* at p 297, italics omitted.)  The lessee did not question the agent about his representations or inform him that these particular tenants were of critical importance to him, did not inform the attorney who reviewed the contract of the representations regarding these tenants and did not propose any revision to the other-tenants clause despite proposing a number of other modifications to the lease.  (*Id.* at pp. 302–303.)  The court concluded:  "In the complete absence of any actions taken to question, clarify, or confirm the contractual status of the three cotenants, to notify his attorney of the representations or to modify paragraph 25.33, Hinesley could not justifiably rely on his understanding of the representations and gestures made by Petrovich."  (*Id.* at p. 303.)

Beverly asserts that Hong's reliance was even less justifiable because, in addition to the disclaimers in the lease, Hong's broker informed her that the Department would not allow her to sell alcohol.  According to Hong's testimony, prior to the email from the broker she had been told by the Department that there would be no problem opening a full-service restaurant in these premises, and Beverly had told her there had always been

---

negligent, are against the policy of the law.' " (*Manderville, supra,* 106 Cal.App.4th at p. 1500.)

full-service restaurant with a liquor license in this space. Upon receiving the broker's email, Hong turned to Beverly, who provided what Hong took to be reassurance that this new information was not correct. Hong testified that she understood Beverly's email as providing evidence that the property had been used with a liquor license since 1934, and that Beverly was explaining the history to her "[b]ecause she knew that—without the alcohol license, she knew that I'm not going to really—actually devoted to signing the lease." Hong did not see a need to inquire further of her broker because the "landlord seems like she knows everything is right" and was providing Hong with "all the evidence that it has been always a full-service restaurant and a bar." Hong also testified that the broker told her she would not be able to get a *new* liquor license but since Beverly told her Le Bordeaux had a liquor license, she understood that she would be transferring it, as she had done when she opened her first restaurant, and not seeking a new one.[25]

Beverly had owned the property for 35 or 40 years and presented herself as intimately informed of its history. This was not the case for Hong's broker. Whether it was reasonable for Hong to rely upon the reassurance Beverly provided was a factual question for the jury. Beverly argues it was unreasonable for Hong to assume, based on Beverly's representations, that the Department would grant what it told the broker it would not grant—but the Department did initially approve Hong's restaurant based on the then-existing conditional use permit. It was only after the Department was alerted to the historical vacancy between The Field and Le Bordeaux and discovered Le Bordeaux was operating without a liquor license that it reversed its position. This underlying information was known to Beverly all along, but not to Hong. Unlike the lessee in

---

[25] Beverly's assertion that "there is no evidence in the record of any discussion of 'transferring' a license" ignores this testimony from Hong. Beverly correctly points out that the zoning affidavit suggests Hong applied for a new license, as it indicates that the "type of license applied for" was "41" and makes no reference to any transfer. Questioned about this at trial, Hong described her understanding that although every application was a "brand-new application," she was "reregistering" an existing license rather than applying for a "new license." It was for the jury to evaluate Hong's credibility on this point.

25

*Hinesley*, who failed to act in a manner indicating he cared about the allegedly misrepresented information, Hong made clear to Beverly that her ability to open a full-service restaurant with a wine and beer license was critical—as was evident since the lease was expressly limited to such operation.

We agree with Hong that the present case is more like *McClain, supra,* 159 Cal.App.4th 784. In that case, the financial obligations of a shopping center lessee were tied to the size of the leased space, which was specifically stated during lease negotiations. The lease provided that the size of the space stated therein was an approximation the parties agreed was reasonable and payments were not subject to revision if the size in fact differed, as well as that the lessee had had an adequate opportunity to examine the space. Prior to entering the lease, the lessee attempted to confirm the size of the space and the lessors resisted, claiming to be offended by the inquiries and knowledgeable about all details, and insisting the lessee could rely upon their representations. (*Id.* at p. 794.) The lessors knew, or had reason to know, that the space was actually smaller, and the lessee's financial obligations therefore disproportionate. *McClain* held the lease's disclaimers did not insulate the lessors from liability or preclude the lessee from establishing justifiable reliance. (*Id.* at pp. 795–798.)

Here, as in *McClain,* whether Hong was justified in relying upon Beverly's representations was a question of fact for the jury, and substantial evidence supported its findings. While Beverly did not expressly attempt to prevent Hong from further investigating the history of the premises as the lessors in *McClain* did with the lessee's efforts to confirm size, she presented herself as fully knowledgeable—indeed, more knowledgeable than the Department—on the subject, and her representations could reasonably be seen as efforts to induce Hong to proceed with the lease despite her voiced concerns. We are not persuaded by Beverly's attempt to distinguish *McClain* on the basis that the challenged representations were not about physical structure or the likelihood of obtaining zoning approval but rather "several steps removed from that, requiring assumptions and speculation about how the city will interpret its zoning laws in the future." Beverly misrepresented facts that not only *could* result in the Department's

26

refusal to allow Hong to utilize the existing conditional use permit but likely *would* have that result unless the Department was unaware of or chose to ignore them. This presented a risk to Hong that was tangible and material, threatening her ability to fulfill the very purpose of the lease. That the misrepresentations in the present case involve a risk rather than a certainty of injury does not undermine its similarities to *McClain*— misrepresentations by lessors presenting themselves as highly knowledgeable about the facts, and efforts (albeit to differing extents) to dissuade the lessees from questioning their representations.

"It is well established in California that in an action for fraud or deceit, negligence on the part of the plaintiff in failing to discover the falsity of the defendant's statement is no defense when the misrepresentation was intentional. (*Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal.4th at pp. 1239–1240; *Seeger*[, *supra,*] 18 Cal.2d [at p. 414; see also 5 Witkin, Summary of Cal. Law, *supra,* Torts, § 812, p. 1173.)" (*Manderville, supra,* 146 Cal.App.4th at pp. 1502–1503.) " 'The fact that an investigation would have revealed the falsity of the misrepresentation will not alone bar [the plaintiff's] recovery [citations], and it is well established that he is not held to constructive notice of a public record which would reveal the true facts. [Citations].' " (*Id.* at p. 1503, quoting *Seeger,* at pp. 414–415.) Here, in light of the confusion in the Department and the September 2014 approval of Hong's use of the existing conditional use permit, it is not even clear that further investigation at the time would have revealed the falsity of Beverly's representations.[26]

---

[26] Beverly's reliance upon the "as is" clause is also unpersuasive. " '[U]nder particular circumstances, the use of an "as is" provision seems to convey the implication that the property is in some way defective and that the buyer must take it at his own risk. [Citations.] . . . [G]enerally speaking, such a provision means that the buyer takes the property in the condition visible to or observable by him." (*Hinesley, supra,* 135 Cal.App.4th at p. 301, quoting *Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 742.) "The 'as is' clause would be effective as to such observable conditions, but ineffective as to conditions that were not." (*Hinesely*, at p. 301.) The critical facts here were not "observable" in any meaningful sense.

27

" 'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.' " (*Alliance Mortgage, supra,* 10 Cal.4th at p. 1239, quoting *Blankenheim v. E.F. Hutton & Co., supra,* 217 Cal.App. 3d at p. 1475; *Orozco v. WPV San Jose, LLC, supra,* 36 Cal.App.5th at p. 391.)  This is not that rare case.  The jury's verdict is supported by substantial evidence.

**B.**

" 'Concealment is a term of art which includes mere nondisclosure when a party has a duty to disclose.  [Citations.] . . .  [¶] In general, a seller of real property has a duty to disclose:  "where the seller knows of facts *materially* affecting the value or desirability of the property which are known or accessible only to him and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer, the seller is under a duty to disclose them to the buyer. . . ." [Citation.]' (*Reed v. King* [(1983)] 145 Cal.App.3d [261,] 265 [residential real estate transactions], original italics, fn. omitted.)" (*Stevenson v. Baum* (1998) 65 Cal.App.4th 159, 165.)

The theory of Hong's cause of action for fraudulent concealment was that she was induced to sign the lease by Beverly's failure to disclose the gap in time between The Field and Le Bordeaux.  As Hong points out, there was evidence that Beverly did not tell Hong about the length of the vacancy or its implications for the conditional use permit before the lease was executed, and that she attempted to obfuscate the issue by leaving off a page of the summary of permits for the property she sent to Hong.  Beverly contends the jury's verdict on this claim was not supported by substantial evidence for a number of reasons.

The first of these, that the disclaimers in the lease agreement put Hong on notice, we reject for the reasons discussed in connection with the cause of action for intentional misrepresentation:  The disclaimers did not insulate Beverly from liability and there was evidence from which the jury could reasonably conclude that Hong justifiably relied upon Beverly's representations, which failed to disclose the historical vacancy and its implications for the conditional use permit.  Beverly's second argument, that she

28

affirmatively told Hong she would not discuss the information Hong claims was fraudulently omitted, begs the question. Beverly argues that her refusal to discuss the subject should have put Hong on notice that Hong would have to find the information herself. But Hong had no reason to know what there was about the prior tenant that Beverly did not want to discuss and therefore no way to know what she should be investigating. There was evidence that Beverly knew about the vacancy, knew it was at least potentially problematic with respect to the conditional use permit and therefore knew that in refusing to discuss it she was depriving Hong of an opportunity to consider the associated risk; her refusal, especially in light of the evidence that she had not disclosed the vacancy to the owner of Le Bordeaux, did not disclose it to Hong initially or even after problems arose and Hong and her attorney were trying to solve them, was itself evidence of concealment.

Beverly next asserts that there was no evidence she knew the Department would take "its unreasonable position concerning what is a 'full-service restaurant' or reverse its long-standing position (expressed in the Basta Pasta determination) regarding discontinuance of use." They do not expand upon this assertion; the argument they offer on this point is that there was no evidence they knew the omitted information was material to Hong's decision to sign the lease. Acknowledging that there was evidence Beverly knew in 1998 that The Field was required to obtain a new conditional use approval only because it had been more than three years since the prior restaurant at the property ceased operations, Beverly maintains that since no new conditional use approval was required when Le Bordeaux opened, Beverly's knowledge of the significance of the three-year gap in 1998 was insufficient to support the inference that she believed this was still important in 2014. Beverly further asserts it is illogical to assume she knew the historical gap was material because the Department's characterization of Le Bordeaux as a limited restaurant on the basis of it not serving alcohol was inconsistent with the language of the Planning Code, and Grob testified that Hong's restaurant would have been approved if Le Bordeaux had not been a "limited" restaurant.

29

Grob's testimony was somewhat qualified: Asked whether there would have been a problem with the gap between The Field and Le Bordeaux if the latter had gotten an alcohol license, the planner replied, "Not that I recall. We had determined that there was no evidence that a gap had existed or there was little evidence to a gap that we could point to, so we had to reverse our position when we determined that Le Bordeaux had not received an alcohol license." Grob did not testify that a gap between the prior restaurants' tenancies was unimportant; she testified that, to her recollection, the Department did not have evidence of such a gap.

Email correspondence between the zoning administrator and Hong's attorney, however, makes clear that the Department did have such evidence and considered it important. In March 2015, the zoning administrator informed Silverman: "We have not been able to confirm that the use was not abandoned between The Field and Le Bordeaux. It appears that more than three years passed between these two uses, which calls into question the validity of our approval for Le Bordeaux. The zoning administrator subsequently told Silverman he would not accept The Field's lease as evidence that it operated until the lease termination date of August 31, 2008, because DABC records stated its licenses were cancelled in August 2004. Silverman testified, and emails confirm, that he attempted to get information from Beverly to refute this gap but she did not provide it. This is certainly evidence supporting an inference that, despite Grob's testimony, the more than three-year gap was a factor in the Department's reversal of its approval for Hong's restaurant.

Even if the Department's position that Le Bordeaux was a limited restaurant was incorrect under the terms of the Planning Code, Le Bordeaux did not open within three years of The Field's departure. Thus, regardless of whether Beverly could have anticipated the Department's position regarding the Le Bordeaux's liquor license, she had reason to be aware of the potential for problems with Hong's approval because she was aware that the approval of Le Bordeaux was inconsistent with the existing conditional use permit. Not only was this apparent from the terms of the 1998 approval, which Beverly was involved in obtaining, but it was brought to her attention by Permit Expediter Marsha

30

Garland during the tenancy of Le Bordeaux. The record refutes Beverly's suggestion that it would be illogical to assume she knew the vacancy was important.

Nor does the fact that Le Bordeaux was able to open despite the more than three-year vacancy necessarily undermine the evidence that Beverly knew the gap could jeopardize Hong's restaurant. As it turned out, the Department only later learned that The Field did not stay in business until the end of its lease in 2008 (which would have left less than three years vacancy before Le Bordeaux) but rather left in 2004—in other words, that its approval of Le Bordeaux was erroneous. As we have said, there was ample evidence that Beverly repeatedly failed to mention the vacancy and actively attempted to hide it, not only with Hong but previously, with Le Bordeaux, and subsequently, with Optimist Prime. Beverly did not tell Castet there had been a long vacancy, and when Castet asked her about the 10-year vacancy he had been told of by a neighbor, rather than responding with information about its actual length, Beverly said it had not been 10 years and advised Castet not to listen to the neighbors. Even after the problems in the present case, she did not tell Bourque about the vacancy issue or explain what problems Hong had had in "navigating the permit process," and the written disclosure left the reasons for Hong's difficulties vague.[27] As Hong maintain, the very fact that Beverly appeared to go out of her way to avoid discussion of what was obviously a significant issue at all stages of her dealings with all of these tenants is itself a reasonable basis for inferring that she understood its significance.

As to the Basta Pasta letter of determination (see fn.15, *ante*, at p. 13), the jury was of course aware that Beverly claimed to have believed the Department would

---

[27] Hong notes Barak's response, when asked by a juror whether they would have informed the Department of the problem if the Department had concluded there was no vacancy issue after The Field because it believed The Field occupied the space until the end of its lease: "I don't know that we would have stepped up and said, 'Hey, you made a mistake.' " While testimony could be taken as indicating at least a willingness to benefit from the Department's error, this is not the only interpretation; the witness explained that it was not the Smuchas' responsibility to be "watchdogs" over the city's process and they would have thought the decision was purposeful, based on the circumstances of the particular case.

maintain the view that a conditional use approval for a restaurant is not abandoned if the owner continuously markets the subject premises for that use but is unable to find a tenant. But the jury was not required to find Beverly could reasonably rely on the application of this policy to the 524 Union property so as to excuse failing to alert a prospective tenant to the conditional use issue. The vacancy in the present case was considerably longer, and did not occur in an economic period similar to the market collapse that influenced the Basta Pasta determination. And Silverman testified that changes to the city's zoning rules and policies are common, especially when a new zoning administrator takes office.

Beverly argues that the vacancy between The Field and Le Bordeaux was not a secret: According to Garland, it was well known around the neighborhood, and Castet was told by a neighbor that there had been a 10-year vacancy. Beverly maintains that Hong never tried to investigate the history of occupancy of the premises before signing the lease and easily could have learned about the vacancy by asking neighboring businesses. Beverly provides no authority, however, for the proposition that Hong was required to ask around the neighborhood to determine whether Ena North Beach, Inc. was telling her the truth about the property. As earlier described, there was evidence that Beverly told Hong, before the lease was executed, that the property had been used continuously as a bar and restaurant with a liquor license, told her that Le Bordeaux had a liquor license, and did not tell her about the vacancy. There was nothing to suggest to Hong that there was a reason to make inquiries in the neighborhood about the historical usage of the property; she believed Beverly had given her that information.[28]

---

[28] Beverly challenges the argument made by Hong's trial counsel that Beverly prevented Hong from speaking with Garland by refusing to forward Garland's contact information to Hong, thereby preventing Hong from discovering the true facts. In fact, Garland testified that she did not try to contact Hong because she was focused on informing the Department of its mistake and the need for a conditional use permit. That this one aspect of Hong's concealment argument was not supported does not undermine the jury's determination.

Finally, we cannot accept Beverly's argument that Hong's reliance on the omitted information was unjustified as a matter of law. Beverly's position is that Hong's reliance cannot be justified in light of the combination of factors discussed above—the disclaimer provisions in the lease, Beverly's refusal to discuss The Field, the claimed absence of evidence that Beverly was aware of the importance of information about the vacancy, the neighbors' awareness of the vacancy—and the warning from Hong's broker. For the reasons discussed in connection with intentional misrepresentation, justifiable reliance was a factual question for the jury and there is sufficient evidence to support its verdict.

## C.

Beverly contends there was no substantial evidence to support the jury's finding of a breach of the covenant of good faith and fair dealing because the cause of action was based on Beverly allegedly interfering with Hong's right to terminate the lease early by misrepresenting the history of the space, and there was no evidence of misrepresentations during the three-month early termination period (September 1 to December 1, 2014). They point out that although the trial court, in denying the motion for JNOV the verdict on this cause of action, stated there was substantial evidence that Beverly's breaches continued after the parties signed the lease, which gave Hong three months after execution to terminate, the evidence the court cited was of statements made after the early termination period ended.

"Every contract contains an implied covenant of good faith and fair dealing providing that no party to the contract will do anything that would deprive another party of the benefits of the contract. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720; *Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 400.) The implied covenant protects the reasonable expectations of the contracting parties based on their mutual promises. (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373–374; *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1395.) The scope of conduct prohibited by the implied covenant depends on the purposes and express terms of the

33

contract.  (*Carma Developers*, . . . at p. 373.)"  (*Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 885.)

The jury instructions directed that in order to prove breach of the covenant of good faith and fair dealing, ENA North Beach had to establish (1) that it entered into a contract with 524 Union and/or Smucha; (2) that ENA North Beach did substantially all of the significant things the contract required it to do; (3) that 524 Union and/or Smucha "unfairly interfered with ENA North Beach's right to receive the benefits of the contract"; and (4) that ENA North Beach was harmed by 524 Union's and/or Smucha's conduct.  Hong's counsel argued that Beverly interfered with ENA North Beach's right to receive benefits "by continuing to make misstatements after the lease was signed, continuing to tell [Hong] things that were not true, and Silverman things that were not true, and the city.  Interfered with Hong's ability to execute on the contract because one of the things the contract allowed for was an early-out clause.  Right?  If Hong found out early enough about these misstatements, she could have gotten out . . . .  And had [Beverly] not continued to make misstatements early on, then there would be no interference with the opt-out clause" and Hong could have avoided the majority of her damages.

Beverly argues there is no evidence of misrepresentations in the period between September 1, 2014, when the lease became effective, and December 1, 2014, when the early termination period ended.  Just after the lease was executed, however, on August 18, 2014, Beverly emailed Hong, "Since this is a continuation of a long time restaurant with beer and wine only, there shouldn't be any need to go to neighborhood groups."  This statement was a continuation of the prior assertions that Le Bordeaux had obtained a liquor license.  And Beverly's failure to disclose the vacancy between The Field and Le Bordeaux obviously continued throughout the early termination period.

Arguing that concealment of a material fact is a sufficient basis for finding breach of the covenant of good faith and fair dealing, Hong cites two cases arising in the context of insurance bad faith.  (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 906 [insurer's concealment of intention to limit coverage

34

as one basis for inference supporting jury verdict that insurer breached covenant of good faith and fair dealing]; *Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 948 [evidence of concealment of material information from prospective insureds sufficient basis for findings of breach of covenant of good faith and fair dealing and of fraud supporting punitive damages award].) Beverly argues these cases do not support the "broad assertions" for which they are cited, and "[t]here simply is no general principle that any failure to disclose a material fact is a breach of a contract's implied covenant of good faith and fair dealing."

While insurance contracts are in some respects subject to different analysis than contracts in general due to their particular nature (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 46, 52 ["insurance policy cases represent ' "a major departure from traditional principles of contract law" ' "; tort recovery appropriate in insurance setting "because such contracts are characterized by elements of adhesion and unequal bargaining power, public interest and fiduciary responsibility"]), and appellants may be right that "any" failure to disclose a material fact does not necessarily constitute a breach of the implied covenant, it does not follow that failure to disclose material information can *never* support finding such a breach outside the insurance context. Here, where the entire and sole purpose of the contract was operation of a full-service restaurant able to serve wine and beer, it seems obvious that failure to disclose facts that could result in complete inability to achieve that purpose would serve to "deprive" the other party of the benefits of the contract. (*Id.* at p. 53)[29] Just as failure to disclose

---

[29] Citing *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 476, Beverly argues the verdict cannot be supported on the basis of evidence of concealment because this theory was not presented to the jury, and claims of sufficiency of the evidence must be analyzed based on the theories of liability presented in the jury instructions. As indicated above, the jury instructions directed that Hong had to prove Beverly "unfairly interfered with ENA North Beach's right to receive the benefits of the contract." It was counsel's argument that focused on the theory that this element was shown by misrepresentations interfering with the right to early termination. *Arntz,* like other cases standing for the same proposition (e.g., *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 674–675; *Faigin v. Signature Group Holdings,*

35

material information prior to execution of the lease could induce Hong to enter it, failure to disclose that information during the early termination period could induce her not to exercise that right under the agreement.

Hong also argues the jury's verdict is supported by the ample evidence of misrepresentations following the end of the early termination period, during the time after the Department informed Hong it would not approve her restaurant, when Hong and her attorney were trying to convince the Department to reverse its decision.[30] This evidence supports the verdict, Hong maintains, because even after the early termination period ended, Hong had a right of rescission under Civil Code section 1689, subdivision (b)(3), which provides that a contract may be rescinded where " 'the consent [to the contract] of the party rescinding . . . was given by mistake[ ] or obtained through . . . fraud[ ] or undue influence[ ] exercised by . . . the party as to whom he rescinds.' " (*Wong v. Stoler* (2015) 237 Cal.App.4th 1375, 1385.) Hong argues that Beverly's "continuing lies to maintain

---

*Inc.* (2012) 211 Cal.App.4th 726, 737) was concerned with parties attempting to obtain reversal of a jury verdict based on rule of law that had not been presented to the jury, not, as here, a different factual predicate for the legal theory upon which the jury was instructed.

[30] These include, for example, Beverly telling Hong's attorney that The Field left at the end of its lease in 2008, that she thought the zoning administrator was mistaken in stating that The Field's liquor license was cancelled in 2004, and signing the declaration stating—misleadingly, under the circumstances—that the premises had been used "continuously" as a full-service restaurant and bar since the conditional use authorization was obtained in 1998, and that The Field was the lessee under a lease agreement "that was in effect from August 26, 1998, to August 31, 1998." A January 2015 email from planner Grub to Beverly suggests that Beverly told Grub the vacancy after The Field was not more than three years: "From our earlier discussions, I believe that the period of vacancy between Le Bordeaux and the preceding restaurant was less than three years and no CU is required, but I simply do not have documentation to prove it. Any documentation you may have would be very helpful." In March 2015, Beverly continued to tell Hong there had "always" been a liquor license and a full-service restaurant on the premises without mention of the vacancy issue. Beverly also told Hong's attorney that a full-service restaurant had operated there continuously. Beverly told Hong's attorney that since obtaining the conditional use permit in 1998, the premises had been consistently occupied by The Field and Le Bordeaux, except for "a short time when there was catering in there for film productions."

and cover up" the initial fraud in the inducement kept Hong from terminating the contract sooner and thereby incurring fewer damages.

Beverly challenges this theory both because it was not presented to the jury and because the cases Hong relies upon concern rescission as a remedy for fraud or other issues bearing on inducement of a party's entry into a contract, not subsequent breaches of the covenant of good faith and fair dealing. We find it unnecessary to determine the merits of this argument. Even if it would not be a proper basis for affirming the jury's verdict, and even if that verdict were not sustainable on the basis of Beverly's continuing failure to disclose material information during the first three months of the lease, reversing the judgment on the cause of action for breach of the covenant of good faith and fair dealing would not result in any benefit to Beverly in light of our affirmance on the causes of action intentional misrepresentation and concealment.

### D.

Beverly contends there was no substantial evidence to support the award of punitive damages. Aside from the alleged insufficiency of the evidence to support the underlying verdicts, which we have rejected, Beverly argues there was no substantial evidence of the net worth of either 524 Union or Beverly personally.[31]

"Where the defendant's oppression, fraud or malice has been proven by clear and convincing evidence, California law permits the recovery of punitive damages 'for the sake of example and by way of punishing the defendant.' (Civ. Code, § 3294, subd. (a).) As we explained in *Neal v. Farmers Ins. Exchange* [(1978)] 21 Cal.3d 910, 928, and *Adams v. Murakami* [(1991)] 54 Cal.3d [105,] 110–112, the defendant's financial condition is an essential factor in fixing an amount that is sufficient to serve these goals

---

[31] Beverly asserts that because there was no substantial evidence to support the verdicts, "[a] fortiori there was no substantial evidence (much less clear and convincing evidence) to support the finding of malice, oppression, or fraud." She presents no argument that even if the evidence was sufficient to support the verdict for purposes of liability and compensatory damages, it was insufficient to meet the higher threshold required for punitive damages. Accordingly, such argument has been forfeited and we need not address the sufficiency of the evidence to support this finding.

37

without exceeding the necessary level of punishment. '[O]bviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort.' (*Neal*, . . . at p. 928.) '[P]unitive damage awards should not be a routine cost of doing business that an industry can simply pass on to its customers through price increases, while continuing the conduct the law proscribes.' (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 427 (conc. opn. of Brown, J.).) On the other hand, 'the purpose of punitive damages is not served by financially destroying a defendant.' (*Adams*, . . . at p. 112.)" (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1184–1185 (*Simon*).)

It is the plaintiff's burden to introduce evidence of financial condition. (*Adams v. Murakami, supra,* 54 Cal.3d at p. 109.) "An award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition" (*ibid.*); it cannot be based on speculation. (*Id.* at p. 114.) Beverly's argument is that punitive damages award is not supported because the only evidence of the net worth of 524 Union or Beverly herself was Beverly's testimony, which she expressly stated was a "guess."

Asked to estimate the value of 524 Union, Beverly testified, "right now there's a long-term vacancy, and there's some serious deferred maintenance because of the vacancy. So I would be guessing, you know. Usually the value of the property is based on the income, and the income is really low. So I don't know, maybe . . . it's a guess. Maybe 3.5." She then acknowledged that she was a real estate broker and it was her business to know the value of properties, and that determination of the value of a commercial property is "really intensive, looking at the comps, looking at the whole thing." She disagreed with Hong's counsel's suggestion that the value of comparable properties would be around 6.5 million. Asked for an estimate of her net worth, she noted that there was a mortgage of about $700,000 and a lien of about 19,000 to 20,000 on the 524 Union Street property, and a mortgage on her personal residence, which she had purchased in the 1980s for $90,000, as well as taxes and insurance, and that she received social security and worked on commissions, the latter of which had been

38

difficult because of physical issues with her knees. Asked for her "best estimate," she said she would have to "sit there and calculate it out." Given a calculator, Beverly testified, "probably about, on paper, maybe 2.5" million. Her calculations did not include the $91,000 damages she owed Hong, and she did not know what she owed in legal fees since the last billing. Beverly testified that the bulk of the income from 524 Union came from The Field, which had now become difficult to rent; she was trying to obtain "landmarking" for the restaurant space and building, which would supersede the Department and the San Francisco Planning Commission, but that would take a long time and entail "very, very expensive" legal fees. In response to a juror's question, she testified that the Union Street property was about 9,500 square feet and her home was about 2,100 square feet.

Beverly cites *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651, for the statement that "[o]pinion testimony which is conjectural or speculative 'cannot rise to the dignity of substantial evidence.' (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135.)" Of course. But *Roddenberry*, which involved expert opinion regarding postdivorce profits that a former spouse claimed she was due pursuant to a property settlement, is of little use in determining whether Beverly's testimony regarding her own net worth and the value of property owned by the partnership of which she was managing partner constituted substantial evidence of her financial condition. The value of property may be shown by the opinion of the owner. (Evid. Code, § 813, subd. (a)(2); *Sacramento & San Joaquin Drainage Dist.* (1970) 13 Cal.App.3d 58, 64.) The question is whether the owner's characterization of her opinion as a "guess," in the circumstances here, means it was too speculative to be considered substantial evidence.

The trial court, in denying Beverly's motion for JNOV the verdict with respect to punitive damages, "accept[ed] [Beverly's] testimony that the 524 Union property's market value is $3.5 million and that it is encumbered by $870,000 in secured loans, leaving 2.63 million." Though stated to be a "guess," Beverly's testimony as to the value of the property at 524 Union was not wild speculation. As a real estate broker, long-time owner of 524 Union and commercial landlord, Beverly was familiar with the value of this

39

real estate, as well as its encumbrances, which she was able to specify. Her testimony was substantial evidence of 524 Union's financial condition.

Beverly's testimony was also substantial evidence of her own net worth. Again, while she qualified her testimony by couching it in terms such as "probably" and "maybe," it is clear she was not making wild guesses. She understood the components of her net worth—her equity in her home and in 524 Union, her income from social security and real estate commissions, her mortgage and other debt—and was given an opportunity to calculate the estimate she gave at trial. This was substantial evidence of her financial condition.

## II.

Hong's cross-appeal challenges the trial court's reduction of the punitive damages award against 524 Union. Hong contends the trial court erred in reducing the award by means of the JNOV process, as the exclusive procedure for such a reduction is the remittitur process set forth in Code of Civil Procedure Code section 662.5.[32] Under this process, where a new trial limited to damages would be proper, the trial court may "issue a conditional order granting the new trial unless the party in whose favor the verdict has been rendered consents to the reduction of so much thereof as the court in its independent judgment determines from the evidence to be fair and reasonable."[33]

_____

[32] Further statutory references will be to the Code of Civil Procedure unless otherwise specified.

[33] A new trial may be granted on grounds of excessive damages only if "after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (§ 657.) "When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated." (_Ibid._) An order granting a new trial "must state the ground or grounds relied upon by the court, and may contain the specification of reasons." (_Ibid._) On appeal, an order granting a new trial on the ground of excessive damages shall not be affirmed "unless such ground is stated in the order granting the motion" and "it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of

Where the evidence supports a plaintiff's entitlement to punitive damages but the amount of the award is challenged as unreasonably high, the court cannot reduce the amount of damages on a motion for JNOV. (*Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593, 1604–1605 (*Teitel*); § 657.) "The trial court's discretion in granting a motion for judgment notwithstanding the verdict is severely limited. ' "The trial judge's power to grant a [JNOV] is identical to his power to grant a directed verdict [citations]. The trial judge cannot reweigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for [JNOV] should be denied. [Citations.] 'A motion for [JNOV] of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]" ' (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 877–878, quoting *Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110–111.)" (*Teitel,* at p. 1602.)

Here, the trial court found that the evidence supported awards of punitive damages against both Beverly and 524 Union, but that the *amount* awarded against 524 Union was excessive. As *Teitel* explained, "[t]he Legislature has provided an exclusive remedy for a trial court to employ where some damages are properly awarded, but the amount is excessive. That is through a remittitur pursuant to Code of Civil Procedure section 662.5. Were we to accept [the] position that the trial judge is empowered to select an appropriate level of punitive damages and compel its determination by a [JNOV], we would find little or no purpose for the remittitur statute. We do not believe the Legislature intended such a result. Rather, the legislative system as enacted makes it plain that damages, except those which may be determined as a matter of law, are to be fixed by the trier of fact and, if erroneous in amount, subject to the reduction or new trial procedure specified in . . .

---

reasons, and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons." (*Ibid.*)

41

section 662.5, subdivision (b)."[34] (*Teitel, supra,* 231 Cal.App.3d at pp. 1604–1605, fn. omitted.) Further, a trial court granting (or conditionally granting) a new trial motion is required to specify the grounds upon which it is granted and the reasons supporting the decision (§ 657), a requirement that " 'serves the dual purposes of "encouraging careful deliberation by the trial court before ruling on a motion for new trial, and of making a record sufficiently precise to permit meaningful appellate review." [Citations.]' . . . [Citation.]" (*Teitel,* at p. 1605.) "This purpose would be undermined if the trial court could simply reduce punitive damages from one amount to another through a motion for [JNOV]." (*Ibid.*)

Beverly argues that Hong forfeited this challenge to the trial court reducing punitive damages via [JNOV] by failing to raise the point in the trial court, where the problem could easily have been corrected. (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264 [failure to object to jury polling procedure; *Nickerson v. Stonebridge Life Ins. Co.* (2016) 63 Cal.4th 363 (*Nickerson*) [consent to or acquiescence in procedure for presentation to jury of evidence bearing on punitive damages].) This point has some merit. The motion for JNOV asserted that the punitive damages awards should be stricken because they were not supported by the evidence, presenting a legal issue appropriate for disposition on a motion for JNOV; there was no request for a reduction in the amount of punitive damages.[35] At the hearing following the court's issuance of its tentative decision reducing the amount of the punitive damages award against 524 Union,

---

[34] The statutory provision discussed in *Teitel* as subdivision (b) of Code of Civil Procedure section 662.5, subdivision (b), is now subdivision (a)(2) of the statute. (Stats. 2011, ch. 409, § 2.)

[35] In opposition, Hong argued the court was required to deny the motion because substantial evidence supported the jury's findings, citing *Teitel* as "holding '[t]he trial erred in granting the [JNOV] in light of this evidence [i.e., evidence supporting entitlement to punitive damages]' and 'in employing the device of a [JNOV] to reduce the amount of punitive damages[.]' " Hong thus opposed the motion for JNOV and additionally indicated (albeit by citing *Teitel* rather than by argument) the court could not reduce the amount of the award, which Smucha and 524 Union had not asked the court to do.

Hong objected to the court's reduction, but *not* by raising any issue as to the court acting in the context of a [JNOV]; Hong simply argued the merits, stating that the jury's award was within constitutional limits. Clearly, as the court was hearing argument on both the motion for JNOV and the new trial motion, it could easily have rectified the problem if it had been brought to the court's attention.

As the appropriate procedure for reducing a punitive damages award is solely a question of law, we have discretion to reach it despite Hong's failure to object. (See *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 24.) We do so in order to reiterate what *Teitel* made clear: The procedural mechanism by which a trial court may reduce an award of damages it deems properly awarded but excessive in amount is through a remittitur pursuant to Code of Civil Procedure section 662.5. (*Teitel, supra,* 231 Cal.App.3d at pp. 1604–1605.)

One exception to the exclusivity of this remedy may exist where the trial court concludes the evidence supports an award of punitive damages but finds the amount awarded exceeds constitutional bounds (*State Farm Mut. Auto Ins. Co v. Campbell* (2003) 538 U.S. 408, 418; *BMW of North America v. Gore* (1996) 517 U.S. 559, 574–575; *Simon, supra,* 35 Cal.4th at pp. 1171–1172) and reduces that amount to the constitutional maximum. *Gober v. Ralph's Grocery Co.* (2006) 137 Cal.App.4th 204, 211, 214 (*Gober*), held that an appellate court can determine the constitutional maximum for a punitive damages award on appeal from the denial of a JNOV because the constitutional maximum is a legal question.[36] The trial court had denied the defendant's

---

[36] The defendant in *Gober* challenged a punitive damages award as excessive in motions for JNOV and new trial; the trial court denied the former motion and issued a conditional order granting the new trial motion unless the plaintiffs agreed to accept punitive damages of 15 times their compensatory damages—a significant reduction from the jury's verdict but more than what the defendant sought as representing the constitutional maximum. (*Gober, supra,* 137 Cal.App.4th at pp. 209, 210.) The defendant could not appeal from the new trial order because it was not aggrieved, as the trial court granted relief, albeit less than that requested. (*Id.* at p. 211.) The defendant thus sought review of the constitutionality of the award by appealing the denial of the motion for JNOV.

request for a [JNOV] setting punitive damages at the constitutional maximum. (*Id.* at p. 210.) Rejecting the plaintiffs' argument that the trial court could not have granted the requested [JNOV], *Gober* noted that *Teitel* did not involve a constitutional challenge to the amount of the award and, in holding that punitive damages could not be reduced on a motion for [JNOV], excluded damages "which may be determined as a matter of law." (*Gober,* at p. 212.) While *Gober* was concerned with the appellate court's authority to reduce the award, its reasoning fully supports the trial court having authority to take the same action when it determines a jury's award is constitutionally excessive.

But that does not appear to be what happened here. The trial court did not indicate that the reduced amount of punitive damages it ordered was the constitutional maximum; to the contrary, it stated, "Given the above reduction, the ratios of punitive to compensatory damages are well within 'due process' limits. (*State Farm Mut. Auto Ins. Co v. Campbell*[*, supra,*] 538 U.S. [at p.] 410.)"[37] Beverly is incorrect in citing *Gober* as authority for the proposition that "a court can review the legality of a punitive damage award on JNOV" as an alternative to utilizing the remittitur procedure. *Gober* permits reduction of a punitive damage award to the constitutional maximum on a motion for JNOV; it in no way suggests a trial court can reduce such an award to an amount it deems appropriate short of that constitutional maximum.

---

[37] One of the trial court's citations suggests it viewed the reduced award as the constitutional maximum: The court's first citation after the quoted statement reducing the award was "*Nickerson*[*, supra,*] 63 Cal.4th [at p.] 375 ('appropriate order is for an absolute reduction,' not remittitur)." As more fully explained in *Simon, supra,* 35 Cal.4th at pages 1187–1188, which *Nickerson* cites, reduction rather than remittitur is the appropriate order when the court finds a punitive damages award constitutionally excessive and reduces it to the constitutional maximum. Had *Nickerson* been the only citation in the trial court's order, it would have been clear that the court was following this procedure. But the trial court also cited two cases in which punitive damages awards found excessive for nonconstitutional reasons and the remedy employed was remittitur. (*Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1596 [award so disproportionate to net worth as to raise presumption it was product of passion or prejudice]; *Storage Services v. Oosterbaan* (1989) 214 Cal.App.3d 498, 514 [same].)

44

Here, except for determining and imposing the constitutional maximum, the trial court's authority to reduce the punitive damages award was through its discretion on the motion for a new trial. But in that context, its choices were to grant a new trial pursuant to section 657, subdivision (5) or to issue a conditional order granting the new trial unless 524 Union consented to the reduced amount the court found "fair and reasonable." (§ 662.5, subd. (a)(2).) Neither section 657 nor section 662.5 give the trial court authority to reduce the amount of a punitive damages award through exercise of its independent judgment without using the remittitur procedure.

Generally, the remedy for the court's error in granting the motion for JNOV in order to reduce the punitive damages award against 524 Union would be for us to reverse its order and reinstate the original judgment on the jury's verdict. We cannot do so, however, because—contrary to Hong's argument—the jury's award of $916,925 was not supported by substantial evidence. The ratio of punitive damages to compensatory damages in the jury's verdict was 10:1—at or above the threshold at which an award is "suspect" and "absent special justification . . . cannot survive appellate scrutiny under the due process clause." (*Simon, supra,* 35 Cal.4th at p. 1182.) Putting aside the question whether the conduct in this case was sufficiently "extreme" or "egregious" (*ibid.*) to justify an award in this amount, the jury's award could not be sustained on the evidence of 524 Union's financial condition. The property at 524 Union Street was the only asset of the partnership, and the only evidence on the issue—Beverly's testimony—put its market value of at $3.5 million, reduced to $2.63 due to an encumbrance of $870,000 in secured loans. As the trial court noted, there may be valid reason to suspect a 9,500 building in North Beach is worth more than $3.5 million—but no evidence was presented on this point. The punitive damages award thus amounted to approximately 35 percent of the property's net value as shown by the evidence. Although "case law has not established any specific numerical percentage of net worth as constituting the upper permissible limit for the amount of a punitive damages award" (*Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1539 [upholding award amounting to 23 percent of net worth]), "[p]unitive damages constitute a windfall" and "[s]uch awards generally are

45

not allowed to exceed 10 percent of the net worth of the defendant." (*Michelson v. Hamada, supra,* 29 Cal.App.4th at p. 1596 [award of 28 percent of net worth too high].)

The purpose of punitive damages "is to deter, not to destroy." (*Adams v. Murakami, supra,* 54 Cal.3d at p. 112.) The evidence suggests the only way 524 Union could satisfy a judgment for $916,925 in punitive damages (which, of course, would be in addition to the compensatory damages of $91,692 and attorney fees of $477,121 ordered by the trial court), would be to sell the building. As the trial court also noted, the evidence demonstrated that the restaurant space would be difficult to rent due to the zoning issues. While there was evidence that there were one or two office tenants and a coffee kiosk in the building, there was no evidence as to the income 524 Union derived from the leases of these spaces. Hong's assertions that Beverly could rent the restaurant space for another purpose now, and will be able to rent it for $8,000 to $9,000 a month "when it obtains landmark status," are speculation, not evidence; they ignore the impracticalities and costs of renting an outfitted restaurant space for other purposes, and the uncertainty as to whether and when landmark status might be achieved.

Unlike the cases Hong relies upon, which upheld punitive damages awards supported by evidence of ability to pay despite negative net worth or awards at relative high percentages of net worth (*Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 75, 83 [despite company's reported negative net worth of $1.023 billion, evidence of cashflow profit of $211 million for the year, reported net profit of $12 million, CEO paid $7.6 million, $343 in cash, and ability to borrow $245; award of $4.5 million upheld]; *Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, [despite negative net worth, company had average annual revenue of more than $250 million, net profit of about $7.5 million and credit line of $50 million, with $5.3 million unexpended; award of $300,000 upheld]); *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 391 [no evidence award representing 17.5 percent of annualized net worth would "unduly interfere with or hamper [defendant's] future operations"; $80,000 award upheld]), the present record contains no evidence to support

46

finding 524 Union had the ability to pay the punitive damages award without being effectively "destroyed."

As we cannot reinstate the original judgment on the jury's verdict, correction of the trial court's error would normally require us to remand for the trial court to reconsider the motions for JNOV and for a new trial. But this course of action has been rendered unnecessary. At oral argument, Hong's counsel effectively stipulated that if this court finds the amount of the jury's award unsupported and accepts the amount to which the trial court reduced the award, Hong will accept that result. Counsel made clear his client's paramount desire to avoid further litigation in this matter. In these circumstances, the result of a remand is a foregone conclusion. The trial court has already determined the amount of punitive damages it found fair and reasonable, and Hong has represented she would accept this amount rather than pursuing a new trial. In the interest of efficiency and judicial economy, we will avoid unnecessary further proceedings and simply affirm the judgment.

**III.**

The parties each seek attorney fees on appeal in the event their position prevails, although only Hong offers argument and authorities in support of the request. The lease provides for the prevailing party to recover attorneys' fees "in the event any action should be brought by either party to this lease against the other in connection with this lease." This provision "encompasses all claims, whether in contract, tort or otherwise" (*Maynard v. BTI Group, Inc.* (2013) 216 Cal.App.4th 984, 993), and includes attorney fees on appeal. (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 901; *Starpoint Properties, LLC v. Namvar* (2011) 201 Cal.App.4th 1101, 1111.)

As the prevailing parties on the appeal, ENA North Beach, Hong and Bunyaviroch are entitled to an award of attorney fees, in an amount to be determined by the trial court. (*Center for Biological Diversity v. County of San Bernardino, supra,* 185 Cal.App.4th at p. 901.)

47

The cross-appeal is less clear:  We have rejected Hong's contention that the jury's award of punitive damages should be reinstated, but also rejected Beverly's argument that the trial court could properly reduce the amount of the award through a JNOV.  In light of the parties' shared responsibility for the procedural error, and our rejection of Hong's contention that the amount of the jury's award was supported by substantial evidence, we conclude there is no prevailing party entitled to attorney fees on the cross-appeal.

## DISPOSITION

The judgment is reversed with respect to the award of punitive damages against 524 Union Street, and the original judgment on the jury's verdict is reinstated.  In all other respects, the judgment is affirmed.  The matter is remanded to the trial court for reconsideration of the motions for JNOV and for a new trial with respect to the amount of the punitive damage award against 524 Union Street.

ENA North Beach, Hong, and Bunyaviroch shall recover costs of appeal, including attorney fees, in amounts to be determined by the trial court.

On the cross-appeal, each party shall bear its own costs and attorney fees.

 

                               _____
                               Kline, P.J.

We concur:


_____

Richman, J.


_____

Miller, J.

*Ena North Beach, Inc., et al. v. 524 Union Street et al.* (A152431, A152937)

Trial Court:                                    San Francisco County Superior Court


Trial Judge:                                    Hon. Richard B. Ulmer, Jr.


Attorneys for Plaintiffs and Appellants:        Wood Robbins
                                                B. Douglas Robbins
                                                Leyla M. Pasic
                                                Kelley A. Harvilla

Attorneys for Defendants and Appellants:        Kerr & Wagstaffe
                                                Wagstaffe, Von Loewenfeldt, Busch &
                                                Radwick
                                                James M. Wagstaffe
                                                Michael Von Loewenfeldt

                                                Draper Law Firm
                                                Ann McFarland Draper